IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DEVELOPERS SURETY AND INDEMNITY COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 4:07-CV-03148 |
| vs. | ) ) ) | |
| DISMAL RIVER CLUB, LLC., | ) ) | |
| Defendant, | ) ) | |

**PLAINTIFF'S BRIEF IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT**

COMES NOW Plaintiff Developers Surety and Indemnity Company ("Developers" or "Surety"), and in support of its Motion for Summary Judgment against the Defendant Dismal River Club, LLC ("Dismal River" or "Owner" or "Obligee"), states as follows.

## I.     INTRODUCTION

This matter arises out of the construction of the Dismal River Golf Course in Mullen, Nebraska. The project owner, Dismal River, contracted with Milroy Golf Systems, Inc. ("Milroy Golf" or "Contractor" or "Principal") to install the golf course sprinkler irrigation system which had been designed by Dismal River's separate sprinkler irrigation system design engineers. Dismal River required and Developers, as Surety, provided to Dismal River, as Obligee, a Performance Bond in the penal sum of $534,885 on behalf of Milroy Golf, as Principal. Dismal River now contends that Developers should pay for all of Dismal River's corrective replacement work in that Milroy Golf failed to perform the work required by the contract and that Milroy Golf's work was defective. Sometime after discovering the alleged deficiencies in Milroy Golf's work, Dismal River began substantially correcting the irrigation system work on its own which has cost it over $800,000. Dismal River later told its insurance agent, Joe Riter, of the dispute.

Subsequent to its rebuilding the irrigation system, Dismal River sent a letter to Developers that Milroy Golf had failed to complete the contract and requested that Developers reimburse it for the costs and expenses of the corrective rebuilding work. Developers brought this action seeking declaratory judgment on its rights and obligations under the Performance Bond.

In order to allow Developers its rights under the Performance Bond and for Dismal River to recover from Developers under the Performance Bond, Dismal River must satisfy certain conditions precedent of the contract Bond, which are shown on the face of the Bond at paragraph 3. These conditions require that if there is no owner default by Dismal River that Dismal River is to (1) notify Milroy Golf and Developers in writing that it is considering declaring a Contractor Default, **and** (2) request and attempt to arrange a conference with Milroy Golf and Developers, to be held not later than fifteen days after receipt of such notice, to discuss methods of performing the Construction Contract, **and** (3) declare a Contractor Default and formally terminate Milroy Golf's right to complete the contract, **and** (4) agree to pay the balance of the Contract Price to Developers or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the owner. Developers is then given options to complete performance of the contract per paragraph 4 of the Bond. Dismal River failed to provide Developers these rights and failed to satisfy these required conditions precedent; and Developers is, therefore, discharged from any obligation or liability under the Performance Bond.

These conditions precedent are explicit provisions of the Performance Bond intended to unequivocally notify Developers that disputes have gotten to the point of considering declaring a contractor default, calling for the requisite meeting, declaring a default and formally terminating the principal contractor's right to complete. These conditions must be done by Dismal River, the

Obligee, in order to give Developers, the Surety, sufficient opportunity to investigate work-related disputes between Milroy Golf, the Principal contractor, and Dismal River, to allow Developers the opportunity to participate in the resolution of any disputes, and to preserve contract funds in the event Developers is required to perform under the Bond.   Until these conditions precedent are done by Dismal River, Developers has no legal right or liability under the Bond to pay for or to complete the contract between Milroy Golf and Dismal River.

By choosing to remedy the alleged defects in Milroy Golf's performance without fulfilling the Bond's requirements, Dismal River denied Developers substantial rights under the Performance Bond.   Developers is a surety that has significant experience with golf course projects.   This denial has prejudiced Developers and its obligations under the Performance Bond are therefore discharged as a matter of law.   Developers is entitled to summary judgment.


## II.    STATEMENT OF UNCONTROVERTED FACTS

1.    On or about April 27, 2005, Dismal River contracted with Milroy Golf to construct an irrigation system on the Dismal River Golf Course (the "Project").   The Agreement was on a Standard Form AIA A-101-1997.   (*Agreement,* ***Exhibit "A"*** *hereto*)

2.    On or about May 6, 2005, Developers, as Surety, issued Performance Bond No. 558529P to Dismal River, as Obligee, on behalf of Milroy Golf, as Principal, for the Dismal River Club irrigation system, in the penal sum of $534,885.   The Bond is an AIA A-312 performance bond.   (*Performance Bond,* ***Exhibit "B"*** *hereto*).   On information and belief, the Colorado entity defendant Dismal River Club, LLC has assigned all of its rights, obligations and interests in the Dismal River Club Golf Course to the Nebraska entity Dismal River Club II, LLC; however, proof of the assignment or otherwise has not been provided by either.

3.     Milroy Golf worked on the Project from June, 2005 to October, 2005. By November, 2005, Milroy Golf had substantially completed its work and removed its equipment and personnel from the jobsite. (*"Affidavit of J.T. Milroy, ¶¶ 4 and 7, **Exhibit "C"** hereto*)

4.     By July 23, 2005, Dismal River's Superintendent, Kyle Jacobsen, was aware of alleged unacceptable conditions on the Project related to Milroy Golf's work. (*E-mail, dated July 23, 2005, **Exhibit "D"** hereto*)

5.     On or about October 24, 2005, Dismal River's separate sprinkler irrigation system design engineering consultant, Justen Patterson, informed Dismal River of problems with the irrigation system installation of the principal contractor, Milroy Golf. (*Letter, **Exhibit "E"** hereto*)

6.     According to Mr. Patterson, remediation efforts on the irrigation system began as early as **September 30, 2005**. (*Dismal River Accounting, **Exhibit "F"** hereto*)

7.     On or about February 6, 2006, Developers sent Dismal River a letter entitled "*Request for Contract Status*", wherein Developers sought information from the owner as to the completion of the project. (*Request for Contract Status, dated February 6, 2006, **Exhibit "G"** hereto*)

8.     On or about March 15, 2006, Dismal River, through its agent Dick Burtness, signed the "*Request for Contract Status*", noting that "major issues yet to be resolved", and returned the same to Developers.  There was no "considering declaring a contractor default". (*Request for Contract Status, **Exhibit "G"***)

9.     Developers received the signed "*Request for Contract Status*" on March 22, 2006. (*Request for Contract Status, **Exhibit "G"***)  This was the first information Developers received

that there may be problems on the Project. (*Affidavit of Mitchell T. Petras,* ¶ *6,* **Exhibit "H"** *hereto*)

10. On or about April 28, 2006, Dismal River sent a letter to J.T. Milroy (Milroy Golf) requesting partial payment of $100,000 for damages and inviting Mr. Milroy to view the evidence of defective performance. (*Letter, dated April 28, 2006,* **Exhibit "I"** *hereto*) This letter was not provided to Developers. (*Affidavit of Mitchell T. Petras,* ¶ 7, **Exhibit "H"**).

11. On or about June 12, 2006, Dismal River sent another letter to J.T. Milroy (Milroy Golf) regarding Milroy Golf's work under the contract. (*Letter, dated June 12, 2006,* **Exhibit "J"** *hereto*)

12. On or about June 19, 2006, Dick Burtness (Dismal River) sent an e-mail to Joe Riter, the insurance agent who secured the Bond on behalf of Dismal River, and attached a copy of its June 12, 2006 letter to J.T. Milroy. (*E-mail, dated June 19, 2006,* **Exhibit "K"** *hereto*)

13. Joe Riter met with J.T. Milroy on June 23, 2006 to discuss the situation and to hear Milroy Golf's version of events. Mr. Riter also requested additional information from Milroy Golf relating to the Project. (*Affidavit of Joe Riter,* ¶ *5,* **Exhibit "L"** *hereto*)

14. On or about June 24, 2006, Joe Riter responded to Dick Burtness' email of June 19, 2006, and requested details and documentation from Dismal River supporting the work and additional costs of the Project. (*E-mail, dated June 24, 2006,* **Exhibit "K"** *hereto*); (*Affidavit of Joe Riter,* ¶ *6,* **Exhibit "L"**)

15. On or about June 29, 2006, Joe Riter sent Dick Burtness (Dismal River) another response e-mail to follow-up on Joe Riter's June 24, 2006 e-mail. (*E-mail, dated June 29, 2006,* **Exhibit "M"** *hereto*)

16.     On or about June 29, 2006, Dick Burtness (Dismal River) sent a letter to Joe Riter confirming that he received the prior e-mails, complaining of the problem Dismal River was having with Milroy Golf, and adding "I strongly recommend you send someone out here to see all the evidence and talk to our maintenance people." There was no "considering declaring a contractor default". (*Letter, dated June 29, 2006, **Exhibit "N"** hereto*)

17.     By October 24, 2006, Dismal River had completed rebuilding and remediation of the irrigation system on the Project. (*Dismal River Accounting, **Exhibit "F"***)  According to Dismal River's own accounting, the vast majority of remediation occurred between April, 2006 and October, 2006.

18.     Neither Joe Riter or Developers had received supporting documentation from Dismal River relating to its possible "claim" prior to the corrective work being completed By Dismal River in October, 2007. *Affidavit of Joe Riter, ¶ 7, **Exhibit "L"***; *Affidavit of Mitchell T. Petras, ¶ 9, **Exhibit "H"***)

19.     Even though it had not received supporting documentation from Dismal River, Developers sent a formal letter to Milroy Golf about the dispute on November 13, 2006, requesting a response from Milroy Golf as to the status of the situation, the details of the dispute and any attempts to resolve it. (*Letter, dated November 13, 2006, **Exhibit "O"** hereto*)

20.     On or about March 1, 2007, Counsel for Dismal River demanded payment of damages from Milroy Golf in its notice regarding failure to perform under the contract. (*Larry Bauman letter to Milroy Golf, dated March 1, 2007, **Exhibit "P"** hereto*)

21.     On or about March 1, 2007, Counsel for Dismal River also notified Developers of the claim, stating: "[t]he contractor walked off the job before it was completed so therefore the final work had to be completed by others", and "[t]he contractor failed to meet the standards of

his contract and also failed to complete the contract". The letter suggested a meeting. (*Larry Baumann Letter to Developers, dated March 1, 2007, **Exhibit "Q"** hereto*) This was the first notification Developers received from Dismal River that Milroy Golf was making a claim against the Performance Bond. (*Affidavit of Mitchell T. Petras, ¶ 8, **Exhibit "H"***) This was 17 months after September 30, 2005, when Dismal River first did corrective work.

22.    Until March 1, 2007, Developers did not receive from Dismal River any formal claim under the Performance Bond and Developers believed that Dismal River and Milroy Golf were working through their dispute. This belief was reinforced by Dismal River's failure to provide Developers with any documentation supporting any claim. (*Affidavit of Mitchell T. Petras, ¶¶ 9 and 10, **Exhibit "H"***)

23.    On or about March 15, 2007, Milroy Golf responds to Larry Bauman's letter and requests supporting documentation of Dismal River's alleged damages. (*Letter, dated March 15, 2007, **Exhibit "R"** hereto*)

24.    On or about March 23, 2007, Developers sent a letter to Dismal River's counsel, Larry Bauman, (1) acknowledging receipt of his March 1, 2007 letter, (2) evidencing Developers' interest in meeting to discuss the problems, and (3) requesting supporting documentation from Dismal River prior to a meeting. (*Letter, dated March 23, 2007, **Exhibit "S"** hereto*)

25.    On or about May 8, 2007, Developers sent another letter to Larry Bauman again seeking the necessary information for it to investigate Dismal River's claim. (*Letter, dated May 8, 2007, **Exhibit "T"** hereto*)

26.    On or about May 18, 2007, Dismal River's counsel sent a letter to Developers providing some supporting documentation and requesting a meeting at the site. The letter was

received by Developers on or about May 22, 2007. (*Letter, dated May 18, 2007,* **Exhibit "U"** *hereto*)

27.     Representatives of the Surety, Principal, Owner and Architect met at the Project Site to discuss the dispute on June 11 and 12, 2007. (*Affidavit of Conrad Wozney,* ¶ *10,* **Exhibit "V"**) Dismal River stated that it spent over $800,000.00 and demanded that Developers pay it the $534,885 penal sum of the Performance Bond.

28.     Developers has experience in completing golf course projects by utilizing qualified independent contractors, and could have significantly lowered the costs of remediation on the Dismal River Golf Course had it been involved in completing performance prior to Dismal River attempting remediation. (*Affidavit of Conrad Wozney,* ¶¶ *6, 7, 8 and 9,* **Exhibit "V"**).

## III.     SUMMARY JUDGMENT STANDARD

The moving party is entitled to summary judgment if it can demonstrate that (1) there is no genuine dispute as to any material fact; and (2) summary judgment is appropriate as a matter of law. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986). It is only proper when the pleadings, depositions, admissions, stipulations and affidavits in the record disclose no genuine issue of material fact or ultimate inferences that may be drawn from those facts. Popple v. Rose, 254 Neb. 1, 573 N.W. 765 (1998). The party moving for summary judgment has the burden to show that no genuine issue of material fact exists and must produce sufficient evidence to demonstrate that the moving party is entitled to judgment as a matter of law. After the moving party has shown facts entitling it to judgment as a matter of law, the opposing party has the burden to present evidence showing an issue of material fact which prevents a judgment as a matter of law. Melick v. Schmidt, 251 Neb. 372, 557 N.W.2d 645 (1997).

## IV.   ARGUMENT AND AUTHORITIES

### A.   A Performance Bond is to be Interpreted According to its Terms

Milroy Golf entered into a contract with Dismal River, whereby it agreed to construct the sprinkler irrigation system per Dismal River's design on Dismal River's golf course. (*Statement of Uncontroverted Facts ("SOF") No. 1*).  Developers, as Surety, issued a Performance Bond to Dismal River, as Obligee, on behalf of Milroy Golf, as Principal, relating to the performance of the construction of the sprinkler irrigation system Construction Contract. (*SOF, No. 2*).

The Performance Bond is a contract and is subject to the same general rules of interpretation applicable to other contracts.  Spittler v. Nicola, 239 Neb. 972, 479 N.W.2d 803 (1992).  Where a contract is plain and unambiguous in its meaning it will be enforced according to its terms.  Watkins Products, Inc. v. Busch, 184 Neb. 359, 362, 167 N.W.2d 574, 576 (1969) citing Orshek v. State, 174 Neb. 668, 119 N.W.2d 48 (1963).  Nebraska law is clear that a surety cannot be held liable beyond the strict terms of its contract.  Nebraska Beef, Ltd. v. Universal Surety Co., 9 Neb.App. 40, 607 N.W.2d 227 (2000).  Accordingly:

> Any intention on the part of the surety to assume a further and continued liability must be found in the words of the contract made.  It is not a matter of inference, but of express statement.  The liability of a surety, therefore, is measured by, and will not be extended beyond, the strict terms of his contract.

Wagner v. Amwest Surety Ins. Co., 274 Neb. 110, 116, 738 N.W.2d 805, 810 (2007) quoting Farmers Union Co-op Assn. v. Mid-States Construction Co., 212 Neb. 147, 153, 322 N.W.2d 373, 377 (1982).

### B.   The Bond Contains Conditions Precedent to Performance by the Surety

A condition precedent is "a condition which must be performed before the parties' agreement becomes a binding contract, or a condition which must be fulfilled before a duty to

perform an existing contract arises." Schmidt v. J.C. Robinson Seed Co., 220 Neb. 344, 349, 370 N.W.2d 103, 107 (1985). Where a contract is executed but its effectiveness is dependent upon the fulfillment of an agreed condition, that contract cannot be enforced unless the condition is performed. See, e.g., Chadd v. Midwest Franchise Corp., 226 Neb. 502, 412 N.W.2d 453 (1987).

The Bond in this case conforms to the language of the industry standard, American Institute of Architects, AIA A-312 performance bond, and sets out the following conditions precedent before Developers becomes obligated under the Bond:

3.      If there is no Owner Default, the Surety's obligation under this Bond shall arise **after**:

3.1      The Owner has notified the Contractor and the Surety at its address described in Paragraph 10 below that the Owner is considering declaring a Contractor Default **and** has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later that fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; **and**

3.2      The Owner has declared a Contractor Default **and** formally terminated the Contractor's right to complete the contract. Such Contractor's Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; **and**

3.3      The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

(*Exhibit "B", SOF, ¶ 2*) (emphasis added).

It is only after the Owner satisfies its conditions precedent obligations contained in Paragraph 3 of the Bond that the Surety has liability under the Bond. Then, paragraph 4 of the Bond grants the Surety several options of performance:

4.      When the Owner has satisfied the conditions of Paragraph 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

4.1     Arrange for the Contractor, with consent of the Owner, to perform and complete the Construction Contract; or

4.2     Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors; or

4.3     Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Paragraph 6 in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's default; or

4.4     Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

      1.      After investigation, determine the amount of which it may be liable to the Owner and, as soon as practicable after the amount is determined, tender payment therefore to the Owner; or

      2.      Deny liability in whole or in part and notify the Owner citing reasons therefore.

(***Exhibit "B", SOF, ¶ 2***) (emphasis added).

No letter said considering declaring a contractor default, declared a contractor default, and formally terminated the contractor's right to complete nor agreed to pay the balance of the contract price to the surety.

## C.      The Surety is Not Liable under the Bond When the Obligee Fails to Satisfy the Conditions Precedent Contained in the Bond

The AIA A-312 bond provisions are designed with many purposes in mind.  Early notices to the contractor and surety are instrumental in avoiding complete forfeiture by the contractor; the "meet and confer" conference promotes the resolution of disputes; and the requirement of

declaring a default shows that the parties have come to a complete impasse and affords the surety

the opportunity and ability to be involved in completing performance when necessary.

Courts have significantly recognized that the steps required of an owner under these types

of bonds are valid conditions precedent to a surety's obligations under the Bond. See, e.g., 120

Greenwich Development Associates, LLC v. Reliance Ins. Co., 2004 WL 1277998 (**S.D.N.Y.**

2004) (finding that paragraph 3 of the AIA A-312 bond "creates unambiguous preconditions for

triggering [the surety's] obligations under the Bond . . ."); United States Fid. and Guar. Co. v.

Braspetro Oil Services Co., 219 F.Supp.2d 403, 477 (S.D.N.Y.) aff'd in part, rev'd in part, Nos.

02-9185 & 02-9187, 2004 WL 1119583 (2nd Cir. 2004) (holding that the actions required in

paragraph 3 of the AIA A-312 bond "plainly constitute conditions precedent" under New York

law); Bank of Brewton, Inc. v. Int'l Fid. Ins. Co., 827 So.2d 747 (**Ala.** 2002) (finding that the

provisions in Paragraph 3 of the AIA A-312 bond clearly constitute conditions precedent with

which an obligee must comply in order to trigger the surety's obligations); North American

Specialty Ins. Co. v. Chichester School District, 2000 WL 1052055, 16 (**E.D.Pa.**) (the paragraph

3 of AIA A-312 bond requirements act as conditions precedent to the paragraph 4 obligations of

the surety); Dadeland Station Associates, Ltd. v. St. Paul Fire and Marine Ins. Co., 2003 WL

21981974, 13 (**S.D.Fla.**) (sureties are not required to do anything until the owner triggers the

contractor default procedure in paragraph 3 of the AIA A-312 bond); Enterprise Capital, Inc. v.

San-Gra Corp, 284 F.Supp.2d 166, 179 (**D.Mass.** 2003) ("This Court has concluded that the

relevant provisions were indeed conditions precedent.  In support of this conclusion, the Court

notes that other courts have consistently interpreted the language in this Performance Bond – 'the

Surety's obligation under this Bond shall arise after . . .' – to indicate the listing of conditions

precedent."); Tishman Westside Constr. LLc v. ASF Glass, Inc., 823 N.Y.S.2d 71, 72 (**N.Y.**

App. 2006) (the court affirmed summary disposition to the surety, finding that "[the surety] was discharged from its liability on its surety bond because plaintiff materially breached its contractual duties to [surety] by failing to provide [surety] with the opportunity to exercise its options under paragraph 4 of the [AIA A-312] bond.")

The rationale behind these decisions is that when an owner prematurely arranges for completion of a project, it effectively strips the surety of its contractual ability to determine how it will proceed.   According to the Court in <u>Balfour Beatty Construction, Inc. v. Colonial Ornamental Iron Works Inc., et al.</u>, 986 F.Supp. 82 (**D. Conn.** 1997),

> [p]erformance bond requirements for notice of default and demand that the surety step in and perform under the bond must be met before an obligee can recover damages under the performance bond . . . the [obligee] in the present case allowed [another contractor] to complete the project, thereby denying [the surety] the opportunity to exercise any of its options under the performance bond.

<u>Id</u>. at 86.

"Courts have consistently held that an obligee's action that deprives a surety of its ability to protect itself pursuant to performance options granted under a performance bond constitutes a material breach, which renders the bond null and void." <u>St. Paul Fire & Marine Ins. Co. v. City of Green River</u>, 93 F.Supp.2d 1170, 1178 (**D. Wyo.** 2000).

According to Bruner & O'Connor,

> The surety is entitled to relief if the obligee defaults in its obligations under the bonded contract or otherwise acts in some way to fundamentally increase the surety's risks, either by increasing the potential cost of performance or impairing the surety's right of indemnity and exoneration against the contractor and its indemnitors.

<u>Bruner & O'Connor on Construction Law</u>, § 12:68 (2002).

A good example of this line of reasoning is <u>Dragon Const., Inc. v. Parkway Bank & Trust</u>, 678 N.E.2d 55 (**Ill. App.** 1997). <u>Dragon</u> involved a construction contract which required

the owner to give seven days notice to the contractor and surety prior to termination. Only after termination did the bond obligate the surety to complete performance. The owner terminated the contractor and hired a replacement contractor. Four days later the owner notified the surety that the contractor had been replaced. The court found that the owner's failure to give the performance bond surety timely notice of default and termination prior to hiring its own completion contractor discharged the surety. It stated:

> In order to terminate [the contractor] for any of the causes listed in the construction contract, the [owners] were required to provide seven days' written notice to [the surety]. An obvious reason for this requirement was to allow [the surety] to exercise its right under the performance bond to participate in the selection of a successor contractor. Since the [owner] replaced [contractor] with [another contractor] before informing [the surety] that [contractor] was to be terminated and without consulting [the surety], as to the successor, [the surety] was stripped of its contractual right to minimize its liability under the performance bond by ensuring that the lowest responsible bidder was selected to complete the job.

Id. at 58.

A similar result occurred in School Bd. Of Escambia County, Fla. v. TIG Premier Ins. Co., 110 F.Supp.2d 1351 (**N.D. Fla.** 2000). There, the School Board sought to demolish an existing school and build a new one on the same site. The demolition contractor improperly buried debris at the site in 1995. Prior to, and during, construction of the new building in 1996 and 1997, the School Board learned of the problem and directed the new building contractor (a different entity) to remedy the situation. The new school was completed by the end of 1997. The School Board did not notify the surety of the claim against the demolition contractor until 1999, after the bonded work had been corrected.

The Court recognized that the bond gave the surety several options of performance and noted that "[w]hen the unambiguous language of a contract sets forth the manner in which a party must exercise a remedy in the event of a default, the party is bound by and must strictly

adhere to the language." Id. at 1352-53. The court further recognized the general rule that a material breach occurs, and the bond is null and void, where the action of an obligee "deprives a surety of its ability to protect itself pursuant to performance options granted under a performance bond". Id. at 1354. It, therefore, found that the School Board forfeited its rights under the bond.

For other state's decisions, see e.g. Insurance Company of North America v. Metropolitan Dade County, 705 So.2d 33, 34 (**Fla. 3d D.C.A.** 1997) (wherein the court held the surety was not liable to the owner where the owner failed to properly notify the surety of its principal's default until after completion of the work, thereby stripping the surety of its contractual right to minimize damages); and Elm Haven Const. V. Neri Constr. LLC, 376 F.3d 96 (**2nd Cir.** 2004) (where a contractor hired a replacement subcontractor prior to declaring default, the surety was discharged from its obligations under the bond).

Yet another policy factor supporting this line of cases involves a consideration of the difficult situation confronting a surety when a contractor and owner become involved in a dispute. Until a default is formally declared, the surety may be accused of tortious interference with the business relationship of the parties if it chooses to intervene. After a formally declared default, of course, it has clear contractual duties to become involved.

In L&A Contracting Company v. Southern Concrete Services, Inc., 17 F.3d 106 (**5th Cir.** 1994), for example, the obligee, contractor, failed to provide the surety, for the subcontractor, with notice of the principal's, subcontractor's, default. There the court held, as a matter of law, that the surety was not liable on the performance bond because the contractor failed to give proper notice to the surety as required under the bond. In support of its contention that it had properly "declared" the principal to be in default on the subcontract, the obligee argued that any

communication to the surety that made it clear that the subcontractor failed to fulfill a contract or duty constituted a legal declaration of default. Id. at 110. The court disagreed:

> [s]erious legal consequences attend a declaration of default, particularly in cases such as this involving multi-million-dollar construction projects. Before a declaration of default, sureties face possible tort liability for meddling in the affairs of their principals. After a declaration of default, the relationship changes dramatically, and the surety owes immediate duties to the obligee. Given the consequences that follow a declaration of default, it is vital that the declaration be made in terms sufficiently clear, direct, and unequivocal to inform the surety that the principal has defaulted on its obligations and the surety must immediately commence performing under the terms of the bond.

Id. at 110.

In other words, a proper declaration of default must inform the surety that the principal has committed a material breach or series of material breaches of the subcontract, that the obligee declares a contractor default, formally terminates the contractor's right to complete the construction contract, regards the subcontract as terminated, and informs the surety that it must immediately commence performing under the terms of the bond. See, e.g., Balfour Beatty Construction, Inc. v. Colonial Ornamental Iron Works, Inc., et al., 986 F.Supp. 82 (D. Conn. 1997), supra.

In fact, this concern is one of the reasons the AIA A-311 form was replaced by the AIA A-312 form. In Walter Concrete Constr. Corp. v. Lederle Laboratories, 788 N.E.2d 609 (**NY** App. 2003), the Court found that the AIA A-311 form did not require a declaration of default and formal termination of the contractor's right to complete as a condition precedent to a legal action on the bond. It further stated that "[u]nlike the AIA A-312 bond . . . an action on the AIA A-311 bond is not tied to a declaration of default, the principal's cessation of work or the surety's refusal to perform under the bond" and "[h]ad the parties to the contract desired notice of default as a precursor to liability under the bond, they could have elected to issue the more specific AIA

A-312, which by its terms requires predefault notification to be given to the contractor and surety by the owner". <u>Id</u>. at 610 (emphasis added).

Nebraska also recognizes the generally accepted rule that notice of loss provisions in policies and bonds are valid and enforceable. "Where the giving of notice of loss within the prescribed time is made a condition precedent to liability, failure to comply with such provision prevents recovery. . ." <u>Dockendorf v. Orner</u>, 206 Neb. 456, 461, 293 N.W.2d 395, 398 (1980) (quoting 45 C.J.S. Insurance § 1092 (1946)).

The case of <u>R.C. Walters Co., Inc. v. DeBower</u>, 191 Neb. 544, 216 N.W.2d 515 (1974) is instructive. There, a performance bond was given to guarantee the performance of an appraiser hired by the county to reappraise property. The appraiser failed to complete performance of the contract and was declared in default by the county in 1969. At the time of the default, the appraisal work had been approximately 50% completed. The county and appraiser continued trying to negotiate the contract for two years but were ultimately unsuccessful. In 1971, the county notified the surety of the default. By this time, the value of the work had declined in value. Importantly, the evidence showed that had the surety been informed of the default in 1969, it could have employed a completing contractor to salvage the work done by the original appraiser.

The Bond contained this provision:

PROVIDED, HOWEVER, IT shall be a condition precedent to any right of recovery hereunder that; in the event of default on the part of the Principal, a written statement of the particular facts showing the date and nature of such default shall be immediately given by the Obligee to the Surety and shall be forwarded by registered mail to the Surety.

In its decision, the court adopted the following rule of law:

When a contractor's performance bond requires that notice of default by the contractor be given to the surety within a reasonable time and the failure to give

such notice results in prejudice or damage to the surety, the principal cannot recover on the bond.

Id. at 547.

The court found that the 22 month delay between default and notice to the surety had been unreasonable and barred recovery. Importantly, the court based its decision, at least in part, on the fact that the surety could have reduced the damages sustained had it been given prompt notice of the situation. Here, Developers has experience in completing golf course projects by utilizing independent contractors, and could have significantly lowered the costs of remediation (*SOF, ¶ 28*).

The DeBower case contains language suggesting that Nebraska may require some showing of prejudice to the surety in order for it to avoid its obligations under a bond; however, at least one court has read the DeBower holding as not requiring a specific showing of prejudice on the part of the surety.

In School Bd. Of Escambia County, Fla. v. TIG Premier Ins. Co., 110 F.Supp.2d 1351 (N.D. Fla. 2000), supra, the Court had recognized that a material breach occurs, and the bond is null and void, where the action of an obligee "deprives a surety of its ability to protect itself pursuant to performance options granted under a performance bond". Id. at 1354. The School Board cited the Nebraska's DeBower holding for the proposition that the surety must show prejudice or damage in order to avoid liability under the bond. However, the Escambia Court did not interpret DeBower that way. According to the Court,

> The Court does not read DeBower to place a burden on the non-defaulting surety to come forth with affirmative evidence that it was "prejudiced." Here, the School Board waited an inordinate amount of time, after the breach was discovered and cured, before providing [surety] notice. [Surety] did not have the opportunity to cure the breach or exercise its rights under the performance bond. In essence, [surety] did not have the opportunity to gather the data necessary to demonstrate prejudice. Under these circumstances, prejudice must be presumed.

Id. at 1354.

This result is supported by the Massachusetts case of Seaboard Sur. Co. v. Town of Greenfield, 370 F.3d 215 (1st Cir. 2004). In Seaboard, the court was faced with a similar situation where the owner failed to serve a direct default notice to the surety. While the Court noted that Massachusetts courts had held that the lack of prompt notice to a surety does not discharge the surety if it is is not harmed, it recognized that the purpose of notice requirements was to provide the surety an opportunity to protect itself against loss by participating in the selection of the successor contractor and ensure that the lowest bidder is hired and damages mitigated. Accordingly, "even if [the surety] must show injury, loss, or prejudice, it meets this hurdle, given its deprivation of mitigation opportunities." Id. at 220 (citing Enterprise Capital, Inc. v. San-Gra Corp., 284 F.Supp.2d 166, 177 (**D.Mass.** 2003).

**D.**    **Dismal River failed to comply with the conditions precedent in the Bond**

In the present case, the Bond language, including paragraphs 3 and 4, conforms to the AIA A-312 form of bond, and unambiguously requires the owner to satisfy five important steps before the surety becomes liable, in any way, under the Bond. If the owner is not in default, the owner must (1) notify the contractor and the surety that the owner is considering declaring the contractor in default; (2) request and attempt to arrange a conference with the contractor and the surety within fifteen days of the receipt of the notice to discuss methods of performing the construction contract; (3) wait at least twenty days after the contractor and the surety have received notice that the owner is considering declaring the contractor in default; (4) declare a contractor default and formally terminate the contractor's right to complete the construction contract; **and** (5) agree to pay the balance of the contract price to the surety or an agreed upon

contractor. (***Exhibit "B"***, *SOF*, ¶ 2)  Once these conditions are fulfilled by the owner, the surety may, among other things, (1) arrange for completion of the project by the original contractor, (2) complete the contract itself, through its agents or completing contractors, or (3) obtain bids and arrange for a contract with a new contractor to be secured with new performance and payment bonds. (***Exhibit "B"***, *SOF*, ¶ 2)

Here, the Owner failed to comply with these conditions precedent prior to correcting the work of Milroy Golf.  The obligee never sent any letter considering declaring a contractor default, never declared a contractor default, and never formally terminated the contractor's right to complete.  The first indication Developers received that Dismal River and Milroy Golf may be involved in a dispute was its receipt on March 22, 2006 of Dismal River's Response to the Request for Contract Status, which merely stated "[m]ajor issues yet to be resolved". (***Exhibit "G"***, *SOF*, ¶ 9).  On June 19, 2006, Dismal River forwarded a copy of its June 12, 2006 letter to Joe Riter, telling him about the parties' dispute. (***Exhibit "K"***, *SOF*, ¶ 12).  Upon receipt of this letter, Joe Riter began to investigate the information, met with Milroy Golf, and contacted Dismal River to request additional information. (***Exhibit "L"***, *SOF*, ¶¶ 13, 14).  For the next several months, Developers continued to monitor the dispute, but believed that Milroy Golf and Dismal River were handling the matter on their own. (***Exhibit "H"***, *SOF*, ¶ 22).

While Developers was certainly informed that Dismal River and Milroy Golf were having a dispute on the project, these notices did not indicate that Dismal River was considering declaring a contractor default.  Rather, this correspondence showed a continuing desire on the part of Dismal River to work through the dispute with Milroy Golf.  As evidenced by the correspondence and those directed directly to Milroy Golf, it is clear that Dismal River was still

looking to Milroy Golf for satisfaction under the terms of their contract. (***Exhibit "I"***, SOF, ¶ 10; ***Exhibit "J"***, SOF, ¶ 11).

The Bond also requires that the owner, within 15 days of the initial notice, request or attempt to arrange a conference with both the contractor and surety to discuss methods of performing the construction contract. This "meet and confer" conference is important because it allows all of the interested parties an opportunity to discuss the dispute and resolve it amicably prior to the termination of the contractor's right to complete. In fact, the drafters of the AIA A-312 bond found it so important that it is made a prerequisite to the owner's ability to declare a contractor default.

Here, Dismal River did not say it was considering declaring a contractor default, but only suggested to Developers to visit the site. On June 29, 2006, Dismal River, by letter, "recommended that Developers send someone out here to see all the evidence and talk to our maintenance people." (***Exhibit "N"***, SOF, ¶ 16). However, Dismal River made no genuine attempt to give notice that it was considering declaring a contractor default or to arrange a conference where all interested parties could meet ***together*** in order to discuss methods of completing the contract. This is the "meet and confer" type of conference required by Paragraph 3 of the Bond before any declaration of default may occur. This conference was not attempted, nor did it take place, until June 11 and 12, 2007 (***Exhibit "V"***, SOF, ¶ 27). Of course, by then, Dismal River had already spent over $800,000 and had already completed much of the rebuild and alleged correction work, which Dismal River, the obligee, started to do on September 30, 2005. (***Exhibit "F"***, SOF, ¶ 17).

Despite not arranging, or attempting to arrange, the required "meet and confer" conference, Dismal River, through counsel, purported to claim Milroy Golf failed to complete

the contract in its March 1, 2007 letter to Developers. In that letter, counsel stated, "[t]he contractor failed to meet the standards of his contract and also failed to complete the contract." (***Exhibit "Q", SOF, ¶ 21***). This was the first indication Developers received that Dismal River and Milroy Golf were unable to resolve the dispute between themselves and that a claim was being made on the Bond. (***Exhibit "H", SOF, ¶ 21***).

Developers responded to this letter on March 23, 2007 by requesting information directly from Dismal River's counsel, including the documentation that Joe Riter, had requested of Dismal River in June, 2006. (***Exhibit "S", SOF, ¶ 24***). Also, on May 8, 2007, Developers again requested this information. (***Exhibit "T", SOF, ¶ 25***). Thereafter, representatives of the parties met at the site in Mullen, Nebraska on June 11 and 12, 2007. (***Exhibit "V", SOF, ¶ 27***).

The original contract work had been substantially completed by Milroy Golf in November, 2005. (***Exhibit "C", SOF, ¶ 3***). The rebuild correction work had been completed by Dismal River in October, 2006. (***Exhibit "F", SOF, ¶ 17***). By the time Dismal River made a formal claim against Developers in March, 2007, fifteen (15) months had elapsed from the time Milroy Golf substantially completed its last work on the project (November, 2005), and seventeen (17) months had elapsed from the time the remedial work had been started by Dismal River (September 30, 2005).

Each one of the Bond conditions Dismal River failed to fulfill involved a significant contractual right of Developers. The early notice and "meet and confer" requirements allow the surety to be involved in the early stages of a dispute, thereby promoting an early resolution of the dispute. If this does not work, a declaration of default and formal termination of the contractor's right to complete then affords the surety a legal and contractual right to become involved in completing performance without being accused of interference with contract. The surety then

has several options available to it to complete performance, including the utilization of the original contractor (with owner consent), completing the work itself, through its agents or independent contractors, selecting another contractor through a bid process, or waiving its right to perform and complete, arrange for completion, or obtain a new contractor. The provision requiring the owner to pay the balance of contract funds to the surety grants the surety the use of the contract funds for completion and additional protection against excessive loss. Here, Dismal River had used up all of the remaining contract funds before it sent its notice letter in March, 2007. By precluding the Surety from exercising these rights, Dismal River has materially breached the terms of the Performance Bond relieving the Surety of any obligation to pay under the Performance Bond.

**E.**     **Dismal River's Failure to Comply with the Conditions Precedent in the Performance Bond has Prejudiced Developers**

Dismal River first became aware of problems with Milroy Golf's work at least by July 23, 2005. (***Exhibit "D", SOF, ¶ 4***). Utilizing its own work crews, Dismal River took it upon itself to begin correcting these deficiencies on September 30, 2005. (***Exhibit "F", SOF, ¶ 6***). It was not until March, 2006, several months after Dismal River began correcting the work, that Dismal River first even informed Developers that there may be any problem with any work. (***Exhibit "H", SOF, ¶ 9***). Thereafter, Dismal River continued to look to Milroy Golf for satisfaction, all the while Dismal River continued its remedial corrective work with the labor it had brought to the worksite. It was not until March, 2007, seventeen (17) months after corrective work began by Dismal River on September 30, 2005, that Dismal River made claim against Developers, as Surety for Milroy Golf, and requested a meeting under the Performance Bond. (***Exhibit "H", SOF, ¶ 22***). By then, it was too late for Developers to exercise its rights,

mitigate its damages, or even to gather the necessary facts to demonstrate prejudice.  As we have seen in Escambia and Seaboard, prejudice should be presumed under these facts.

Further, much of the costs incurred by the owner could have been avoided had the Surety been involved in the completion process.  The Surety is a bonding company with extensive experience in the golf course business.  (***Exhibit "V", SOF, ¶ 28***).  It has relationships with competent contractors throughout the country, including those who are very familiar with the installation and repair of sprinkler irrigation systems.  Unlike a situation like this one, where Dismal River utilized whatever labor was available in an ad hoc attempt to correct problems with the irrigation system, Developers would likely have obtained an experienced irrigation contractor to comprehensively address, schedule, review the design, and complete performance.  (***Exhibit "V", SOF, ¶ 28***).  Additionally, the successor contractor could have been selected on the basis of a competitive bidding process, thereby ensuring Developers the lowest possible price to complete the contract.

## CONCLUSION

Dismal River failed to comply with the express conditions precedent terms of the Performance Bond by being in default, by not providing notice to Developers that it was considering declaring a contractor default, by not arranging a "meet and confer" meeting with the Surety and Contractor, by not formally declaring Milroy Golf in default, and by not formally terminating Milroy Golf's right to complete prior to Dismal River itself completing the rebuild correction work.  Each of these failures by the bonded obligee, Dismal River, prevented Developers, as surety, from exercising its rights under the Performance Bond, and constituted a material breach of the contract by Dismal River.  Respectfully, Developers is entitled to judgment as a matter of law.

Further, Dismal River's failure to declare the Principal in default prior to completing remediation significantly prejudiced Developers.  Not only had remediation begun prior to Developers having any knowledge of any dispute, but it was completed well before Dismal River made any claim under the Bond and was asked to pay.  Had Developers been given the opportunity to get involved earlier (which a notice considering declaring a contractor default and requisite meeting would have afforded it), it could have reduced its expenses by working with Milroy Golf or another competent contractor to remedy the situation in a timely and cost effective manner.

Wherefore, Developers Surety and Indemnity Company requests this Court Order Granting its Motion for Summary Judgment against the Defendant, Dismal River Club, LLC, and for such other relief as the Court deems just and proper.

Respectfully submitted,

**LEVY AND CRAIG**
*A Professional Corporation*

Lawrence Lerner        MO #30955
llerner@levycraig.com
C. Eric Pfanstiel        MO #58462
epfanstiel@levycraig.com
1301 Oak Street
Kansas City, Missouri  64106
(816) 474-8181
Fax: 816/471-2186

and

**BALLEW COVALT, PC, LLO**

Victor E. Covalt III    Bar No. 16539
440 S. 13th Street, Suite C
P.O. Box 81229
Lincoln, Nebraska 68501-1229
(402) 436-3030
Fax: (402) 436-3031
Email: vcovalt@bsclawfirm.com

*Attorneys for Plaintiff,*
*Developers Surety and Indemnity Company*

## CERTIFICATE OF SERVICE

Service of the foregoing was effected via electronic transmission through the District Court's ECF filing system this ___/5th___ day of February, 2008 to all counsel of record.

_____
*Attorney for Plaintiff*