IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DEVELOPERS SURETY AND INDEMNITY COMPANY, | ) ) ) | Case No. 4:07-CV-03148 |
| Plaintiff, | ) ) | DEFENDANT'S BRIEF IN OPPOSITION TO |
| v. | ) ) | PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |
| DISMAL RIVER CLUB, LLC, | ) ) | |
| Defendant. | ) | |

COMES NOW the Defendant, DISMAL RIVER CLUB, LLC, and hereby submits the following Brief in Opposition to Plaintiff's Motion for Summary Judgment.

## I.   INTRODUCTION

This matter arises out of the installation of a sprinkler irrigation system on the Dismal River Golf Course in Mullen, Nebraska. Defendant Dismal River Club, LLC (hereinafter "Dismal River" or "Defendant") contracted with Milroy Golf Systems, Inc. (hereinafter "Milroy Golf") to install the sprinkler system. Plaintiff Developers Surety and Indemnity Company (hereinafter "Developers" or "Plaintiff"), as Surety, provided to Dismal River, as Obligee, a Performance Bond in the penal sum of $534,885.00 on behalf of Milroy Golf, as Principal.

Problems arose with Milroy Golf's work on the sprinkler system, and Dismal River spent over $800,000.00 to repair and correct the problems. Dismal River requested that Developers pay it the $534,885.00 penal sum under the

1

Performance Bond. Developers then brought this action for a declaratory judgment of its rights and obligations under the Performance Bond.

Developers alleges that Dismal River did not comply with certain provisions of the Performance Bond and therefore denied Developers substantial rights under the Performance Bond. Developers also alleges that Dismal River's noncompliance has prejudiced it and its obligations under the Performance Bond are therefore discharged as a matter of law.

## II. RESPONSE TO PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS

1. Paragraph 1 of the Plaintiff's Statement of Uncontroverted Facts is admitted.

2. Paragraph 2 of the Plaintiff's Statement of Uncontroverted Facts is admitted.

3. Paragraph 3 of the Plaintiff's Statement of Uncontroverted Facts is admitted.

4. With regard to Paragraph 4 of the Plaintiff's Statement of Uncontroverted Facts, we believe that the characterization would more be accurately stated as Kyle Jacobsen, superintendent of Dismal River, had "several issues that are unacceptable at the Dismal River Club" and was simply providing the method to correct same. (Email, dated July 23, 2005, Plaintiff's Exhibit D).

5. The letter from Justin Patterson to Dick Burtness dated October 24, 2005, is a summary of his findings for the past six weeks while working as an irrigation consultant. He pointed out that the shavings of the HD-PE were obvious and disrupted the mechanism from working properly. He also mentioned some problems with saddles blowing off. (Letter, Plaintiff's Exhibit E).

6. Paragraph 6 of the Plaintiff's Statement of Uncontroverted Facts is admitted.

7. Paragraph 7 of the Plaintiff's Statement of Uncontroverted Facts is admitted.

8. With regard to Paragraph 8 of the Plaintiff's Statement of Uncontroverted Facts, we would agree to the first paragraph of those characterizations of the facts. The Defendant would deny that there is any statement on that exhibit that indicates "that there was no 'considering declaring a contractor default'". (See Plaintiff's Exhibit G).

9. Paragraph 9 of the Plaintiff's Statement of Uncontroverted Facts is admitted. (See Plaintiff's Exhibit H).

10. Paragraph 10 of the Plaintiff's Statement of Uncontroverted Facts is admitted. Further, the letter to J.T. Milroy indicates that Milroy Golf has "stood tall" and it was expected that they would continue to stand behind their work. (See Plaintiff's Exhibit I).

11. Paragraph 11 of the Plaintiff's Statement of Uncontroverted Facts is admitted.

12. Paragraph 12 of the Plaintiff's Statement of Uncontroverted Facts is admitted.

13. Paragraph 13 of the Plaintiff's Statement of Uncontroverted Facts is admitted.

14. Paragraph 14 of the Plaintiff's Statement of Uncontroverted Facts is admitted.

15. Paragraph 15 of the Plaintiff's Statement of Uncontroverted Facts is admitted.

16. With regard to Paragraph 16 of the Plaintiff's Statement of Uncontroverted Facts, the Defendant admits to the first paragraph; however, we would object to the last sentence that "there was no 'considering declaring a contractor default'". There is nothing contained in Plaintiff's Exhibit N with regard to this. It is simply a conclusion. (See Plaintiff's Exhibit N).

17. Paragraph 17 of the Plaintiff's Statement of Uncontroverted Facts is denied. Exhibit F does demonstrate the work that was done on the system, but it does not indicate any completion of any rebuilding or remediation of the irrigation system. (See Plaintiff's Exhibit F).

18. Paragraph 18 of the Plaintiff's Statement of Uncontroverted Facts is denied. Defendant admits that Joe Riter

4

and Developers received notice of the problems with the irrigation system on June 21, 2006. (See emails between Riter and Englund). Further, the Defendant admits that Developers had received documentation from the Defendant in May of 2007, and met with the Dismal River people in June of 2007. (See Plaintiff's Exhibit H, paragraph 9).

  19. Paragraph 19 of the Plaintiff's Statement of Uncontroverted Facts is admitted.

  20. Paragraph 20 of the Plaintiff's Statement of Uncontroverted Facts is admitted.

  21. Paragraph 21 of the Plaintiff's Statement of Uncontroverted Facts is admitted.

  22. Paragraph 22 of the Plaintiff's Statement of Uncontroverted Facts is denied. Defendant admits that until March 1, 2007, Plaintiff did not receive any formal claim under the Performance Bond. Defendant objects to any provision on the beliefs of Plaintiff for the reason that any belief would become a factual issue. The return of the Request for Contract Status, which is Plaintiff's Exhibit G, indicates that "major issues yet to be resolved" would indicate that problems existed.

  23. Paragraph 23 of the Plaintiff's Statement of Uncontroverted Facts is admitted.

  24. Paragraph 24 of the Plaintiff's Statement of Uncontroverted Facts is admitted.

25. Paragraph 25 of the Plaintiff's Statement of Uncontroverted Facts is admitted.

26. Paragraph 26 of the Plaintiff's Statement of Uncontroverted Facts is admitted.

27. Paragraph 27 of the Plaintiff's Statement of Uncontroverted Facts is denied. Defendant admits to the allegations of the first sentence of this paragraph. Further, Defendant admits that at that meeting, Dismal River representatives stated that it has spent over $800,000 in making repairs to the irrigation system.

28. Paragraph 28 of the Plaintiff's Statement of Uncontroverted Facts is denied. Further, the Defendant would state that the Affidavit of Conrad Wozney does not state how they might have "significantly reduced the cost of remediation" when the system would have to be completely rebuilt and trenches dug or deal with the failures as they occur.

As a further portion of the Plaintiff's Statement of Uncontroverted Facts the Defendant would add the following paragraphs.

29. Developers, operating by and through its senior claims examiner, Mitchell T. Petras, indicated as early as June 21, 2006, that they were aware of the potential of a claim being filed against the bond on the Dismal River project. (See Defendant's Exhibit 1).

6

30. That as early as June 21, 2006, there was concern within Developers that they had major problems on the Dismal River project. (See Defendant's Exhibit 2).

31. That Developers was fully aware of ongoing problems with the irrigation system as early as November 13, 2006, when a suggestion was made that "Conrad . . . get out to Nebraska and mediate the protracted dispute". (See Defendant's Exhibit 4).

32. That immediately after the demand letters dated March 1, 2007, were received, Developers met with Milroy Golf through Joe Riter and continued its consideration of this claim. (See Defendant's Exhibit 5).

33. That Milroy Golf's response to the demand letter of March 1, 2007, was also sent to Joe Riter. (See Defendant's Exhibit 6).

34. There was communication as early as November 13, 2006, between Developers and Mitchell T. Petras and Milroy Golf as demonstrated by the 11/13/2006 letter. (See Defendant's Exhibit 7). It was further clear that Developers was contacting attorneys representing Milroy Golf as indicated by the handwritten note on Exhibit 7 and the letter from Jay C. Elliott, an attorney in North Platte, Nebraska, to Milroy Golf, whereby authority was given for him to talk with Developers. (See Defendant's Exhibit 8).

35. Developers took the claim serious and insisted that a representative of Milroy Golf attend the meeting to be held at the golf course. (See Defendant's Exhibit 9).

36. It is clear that Developers had a reasonable idea of the problems with the irrigation system by virtue of the Project Meeting Referral dated May 29, 2007. (See Defendant's Exhibit 10). The representative of Milroy Golf agreed to be at the meeting as shown by the Memorandum of Joe Riter to Mitchell Petras dated June 3, 2007. (See Defendant's Exhibit 11).

37. Joe Riter and Developers were aware of the problems with the irrigation system as shown by the email from Joe Riter dated June 28, 2006. (See Defendant's Exhibit 12).

38. Developers and Joe Riter considered the problems with the irrigation system as a "bond claim", as demonstrated by the Memorandum dated June 29, 2007, which refers to this as a "bond claim" for the past year. Riter also admits receiving a letter from Dick Burtness on June 6th of what had to be 2006. Riter then began to collect information on this claim. (See Defendant's Exhibit 13).

39. Joe Riter kept Developers and Milroy Golf advised of the pending claim as shown by the June 21, 2006, email, which was also sent to Terrie Ingram on June 14, 2007. (See Defendant's Exhibit 14).

40. The Defendant was obviously frustrated at the developments of the irrigation system and maintained contact with J.T. Milroy in June 12, 2006, when a copy of a letter was sent to Developers and that letter is stamped as "received" on June 19, 2006 by the "Claims Department". (See Defendant's Exhibit 15).

41. Developers stopped issuing bonds to Milroy Golf on June 21, 2006, and had a file opened as a "monitor". (See Defendant's Exhibit 16).

42. The Defendant, operating through its attorney, provided information when requested by Developers as demonstrated by a letter dated June 1, 2007. (See Defendant's Exhibit 17).

43. That there were a sequence of failures of the irrigation system beginning on September 30, 2005, but the problems were repaired at that time. The extent of the damage to the golf course over the next year and the failures that occurred were slowly demonstrated. (See Defendant's Exhibit 18).

44. It appears that even though there were minor issues between Milroy Golf and Dismal River early on, Milroy Golf appeared to be attempting to resolve all of the issues including the number of people on site and providing schedules. (See Defendant's Exhibit 19 and 20).

45. The Defendant attempted to work with Milroy Golf in November of 2006, but obviously was frustrated as demonstrated by the letter dated November 7, 2006, to Joe Riter. (See Defendant's Exhibit 22).

### III. ARGUMENT

**A.   Standard of Review**

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate when, "viewing the facts and inferences in the light most favorable to the nonmoving party, 'there is no genuine issue as to any material fact and...the moving party is entitled to a judgment as a matter of law.'" *King v. Asset Appraisal Serv., Inc.*, 470 F.Supp.2d 1025, 1028 (D.Neb. 2006). "In making this determination, the function of the court is not to weigh evidence and make credibility determinations, or to attempt to determine the truth of the matter, but is, rather, solely, to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the court of the basis for its motion," and must identify "those portions of 'the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Id.* The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue

for trial." *Id.* The Court must look to the substantive law to determine which facts are material. "[O]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

This Court has jurisdiction over the subject matter of this action pursuant to the diversity of citizenship provisions in 28 U.S.C. § 1332. The parties are citizens of different States and the matter in controversy exceeds the sum or value of $75,000.00. "A district court sitting in diversity applies the law...of the state in which it sits." *Prudential Ins. Co. of Am. v. Kamrath*, 475 F.3d 920, 924 (8th Cir. 2007). Therefore, this Court must apply Nebraska law to this case.

**B.   There is a genuine issue of fact as to whether Developers had actual notice of the problems with the sprinkler system before March 2006.**

A performance bond issued by a surety is nothing more than a contract guaranteeing or ensuring the performance by the Principal to the Obligee.

> A performance bond guarantees that the contractor will perform the contract, and usually provides that if the contractor defaults and fails to complete the contract, the surety can itself complete the contract or pay damages up to the limit of the bond.

*Cagle, Inc. v. Sammons*, 198 Neb. 595, 599, 254 N.W.2d 398, 402 (1977). "A basic tenet of contract construction is that a contract's meaning is to be ascertained by examining the

11

contract document as a whole." *Dockendorf v. Orner*, 206 Neb. 456, 460, 293 N.W.2d 395, 397 (1980).

"The contract of a surety company, acting for hire, will be strictly construed most strongly against a compensated surety and in favor of an obligee." *Sch. Dist. No. 65R of Lincoln County v. Universal Sur. Co.*, 178 Neb. 746, 753, 135 N.W.2d 232, 236 (1965).

> The general principles of the law involved are that the surety is bound in the manner and to the extent provided in the obligation. A builder's bond is construed most strongly against the surety and in favor of the indemnity which the obligee has reasonable grounds to expect.

*Id.* at 748, 135 N.W.2d at 234. Under this strict construction of a surety contract, "[f]ailure to comply with some of the formal requirements becomes immaterial." *Id.* at 751, 135 N.W.2d at 235.

Performance bonds are similar to insurance contracts, and have even been held to be insurance contracts by the Nebraska Supreme Court.

> Bonds guaranteeing the contracts of third persons, given by paid surety companies to indemnify the owners of property against loss from the failure of contractors to perform the conditions of building or other similar contracts, *are essentially contracts of insurance*, although they may resemble in form contracts of suretyship, since such corporations are in effect insurers, and the strict rules peculiar to contracts of suretyship do not apply in determining their rights and liabilities; rather the rules of liberal construction and of construction against insurer, if an ambiguity exists, does apply.

*Luikart v. Mass. Bonding & Ins. Co.*, 129 Neb. 771, 782-83, 263 N.W. 124, 131 (1935). (emphasis added).

The purpose of notice provisions in insurance contracts are "to alert the insurer to a possible claim and to afford it an opportunity to make such investigation as it deems pertinent to enable it to process any future claim." *Iowa Mut. Ins. Co. of De Witt, Iowa v. Meckna*, 180 Neb. 516, 525, 144 N.W.2d 73, 79 (1966). Similarly, the purpose of a notice provision in a performance bond is to alert the surety to a possible claim and afford it an opportunity to implement its rights and obligations under the performance bond. A provision as to notice of loss "should be construed with great liberality." *Keene Co-op Grain & Supply Co. v. Farmers Union Indus. Mut. Ins. Co.*, 177 Neb. 287, 291, 128 N.W.2d 773, 777 (1964).

In this case, there is a genuine issue of fact as to whether Developers had actual notice of the problems with the sprinkler system before March 2006, when it alleges that it first received an indication of problems.

**C.  There is a genuine issue of fact as to whether Developers was prejudiced by Dismal River's alleged failure to comply with the notice provisions of the performance bond.**

The Nebraska Supreme Court has held that an insurer must show that it was prejudiced by a claimant's failure or

delay in giving notice required under the insurance contract.

> Courts in a substantial number of jurisdictions, Nebraska included, have taken the position that in order to escape liability or the duty to defend on account of an insured's unreasonable and unexcused delay in giving notice of a claim, a liability insurer is *required to show that it was prejudiced.*

*Herman Bros., Inc. v. Great West Cas. Co.*, 255 Neb. 88, 97, 582 N.W.2d 328, 334 (1998). (emphasis added). "[W]here there is no evidence of collusion and it is not shown that the insurer has been prejudiced in its handling of the claim, the failure to give timely notice is not a defense to the claim." *Id.* at 97, 582 N.W.2d at 334-35.

"Prejudice is established by examining whether the insurer received notice in time to meaningfully protect its interests." *Dutton-Lainson Co. v. Contl. Ins. Co.*, 271 Neb. 810, 828, 716 N.W.2d 87, 102 (2006).

> In determining whether a breach of the policy has resulted in prejudice to the insurer, some consideration must be given to the facts and circumstances of the accident which is the basis for the claim against the insured.

*MFA Mut. Ins. Co. v. Sailors*, 180 Neb. 201, 204, 141 N.W.2d 846, 849 (1965). "[T]he mere passage of time generally does not establish prejudice to the insurer." *Herman Bros.* at 97, 582 N.W.2d at 335.

The Nebraska Supreme Court has suggested that there must be prejudice or damage to a surety from the obligee's

14

failure to give notice before it may be released from its obligations under a performance bond

> When a contractor's performance bond requires that notice of default by the contractor be given to the surety within a reasonable time and the failure to give such notice results in *prejudice or damage to the surety*, the principal cannot recover on the bond.

*R.C. Walters Co., Inc. v. DeBower*, 191 Neb. 544, 547, 216 N.W.2d 515, 517 (1974). (emphasis added).

In this case, there is a genuine issue of fact as to whether Developers was prejudiced by Dismal River's alleged failure to comply with the notice provisions of the Performance Bond. Developers alleges that it could have worked with Milroy Golf or another contractor to remedy the situation in a timely and cost effective manner had it received notice earlier. However, there is no evidence that Developers would have been able to remedy the situation for less than what Dismal River spent to make the repairs to the sprinkler system.

### IV. CONCLUSION

There still remain genuine issues of fact as to whether Developers had actual notice of the problems with the sprinkler system, and whether Developers was prejudiced by Dismal River's alleged failure to comply with the notice provisions of the Performance Bond. For these reasons and the reasons set out above, Developers' Motion for Summary Judgment should be denied.

15

Dated this _____ day of March, 2008.

DISMAL RIVER CLUB, LLC, Defendant

By: _____
Larry R. Baumann, #10233
Angela R. Shute, #23562
Of: KELLEY, SCRITSMIER & BYRNE, P.C.
221 West Second Street, Suite 100
P.O. Box 1669
North Platte, NE 69103-1669
Telephone: (308) 532-7110
ksb@nponline.net

Attorneys for Defendant

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing document was sent to all counsel of record via CM/ECF filing, on this 5th day of March, 2008.

Victor E. Covalt III
vcovalt@bsclawfirm.com
Lawrence Lerner
llerner@levycraig.com
C. Eric Pfanstiel
epfanstiel@levycraig.com
Attorneys for Developers Surety and
  Indemnity Co.

_____

LIT2\79BF0303QLB.DOC
12431.7901

16