IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| DEVELOPERS SURETY AND INDEMNITY COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>DISMAL RIVER CLUB, LLC.,<br><br>Defendant, | )<br>)<br>)<br>) Case No. 4:07-CV-03148<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF
## ITS MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff Developers Surety and Indemnity Company ("Developers") and in Reply to Defendant Dismal River Club, LLC's ("Dismal River") Response Brief, and in support of Developer's Motion for Summary Judgment, states as follows:

### I. REPLY TO DEFENDANT'S ADDITIONAL STATEMENT OF UNCONTROVERTED FACTS

29. Paragraph 29 of Defendant's Additional Statement of Uncontroverted Facts is admitted.

30. Paragraph 30 of Defendant's Additional Statement of Uncontroverted Facts is denied. While Developers understood that there was potential for a claim on the Dismal River project, Defendant's Exhibit 2 does not support the contention that Developers understood that "they had major problems on the Dismal River project." In fact, Defendant's Exhibits 2 and 3 suggest that Developers still anticipated that the Principal would resolve any issues or dissatisfactions.

31. Paragraph 31 of Defendant's Additional Statement of Uncontroverted Facts is admitted.

32. Paragraph 32 of Defendant's Additional Statement of Uncontroverted Facts is admitted.

33. Paragraph 33 of Defendant's Additional Statement of Uncontroverted Facts is admitted.

34. Paragraph 34 of Defendant's Additional Statement of Uncontroverted Facts is admitted.

35. Paragraph 35 of Defendant's Additional Statement of Uncontroverted Facts is admitted.

36. Paragraph 36 of Defendant's Additional Statement of Uncontroverted Facts is admitted.

37. With regard to Paragraph 37 of Defendant's Additional Statement of Uncontroverted Facts, Plaintiff denies the allegation that Joe Riter and Developers were aware of "the problems. . ." Plaintiff submits a more accurate statement would be that that Joe Riter and Developers were "generally aware of problems", but that these problems did not rise to a level for Dismal River to be "considering declaring a contractor default" as required by the Performance Bond. The remaining allegations of Paragraph 37 are admitted.

38. Paragraph 38 of Defendant's Additional Statement of Uncontroverted Facts is denied. This memorandum was prepared by Joe Riter and it is clear there was only a dispute in June, 2006 and that no claim or notice of claim was made until March, 2007. This memorandum is not indicative of how Developers categorized its knowledge of the dispute or problems on the Dismal River Golf Club project prior to Dismal River's March 1, 2007 letter from its attorney to Developers. It should be noted that this memorandum was prepared after Dismal River's claim letter of March 1, 2007 and after the parties considered that a bond claim had been made by

Dismal River. Importantly, Dismal River cannot point to any correspondence or document, prior to counsel's March 1, 2007 letter, showing that Developers considered Dismal River to be even marginally complying with the condition precedent terms of paragraph 3 of the Performance Bond and letting Developers know that Dismal River was even considering declaring a contractor default. The second sentence of Paragraph 38 of Defendant's Additional Statement of Uncontroverted Facts is admitted.

39. Paragraph 39 of Defendant's Additional Statement of Uncontroverted Facts is admitted.

40. With regard to Paragraph 40 of Defendant's Additional Statement of Uncontroverted Facts, Plaintiff admits the substance and receipt of the letter referred therein. Plaintiff objects to Dismal River's conclusion that Defendant "was obviously frustrated".

41. Paragraph 41 of Defendant's Additional Statement of Uncontroverted Facts is admitted.

42. With regard to Paragraph 42 of Defendant's Additional Statement of Uncontroverted Facts, Plaintiff admits that Defendant's counsel, in June, 2007, attempted to provide some of the information as requested by Developers. Plaintiff denies any conclusion that Defendant's counsel completely provided all information requested by Developers or that all information was provided timely.

43. With regard to Paragraph 43 of Defendant's Additional Statement of Uncontroverted Facts, Plaintiff does not deny that Defendant's Exhibit 18 tends to support Defendant's contention. However, Plaintiff does not admit to the authenticity or accuracy of Exhibit 18, which appears to have been prepared after the repair/replacement work had already been completed by Dismal River on its own.

44. Paragraph 44 of Defendant's Additional Statement of Uncontroverted Facts is admitted.

45. Paragraph 45 of Defendant's Additional Statement of Uncontroverted Facts is denied. Plaintiff admits the authenticity of Defendant's Exhibit 21, but denies the conclusions Dismal River attempts to draw from it.

## II. ADDITIONAL UNCONTROVERTED FACTS

46. According to Dismal River's own accounting, Dismal River spent $872,600.00 of work on the system from September 30, 2005 to October 24, 2006. (*Plaintiff's Exhibit "F"*).

47. Developers could have utilized the experience of several golf course managers and construction experts to assist it in evaluating the nature, extent and scope of the problem. (*Supplemental Affidavit of Conrad Wozney, ¶¶ 4 and 5, Exhibit "W"*).

48. If the parties would have included experienced consultants in the assessment of the system earlier, the owner may have avoided the need to dig up the course, uncover the irrigation system and return it to preexisting conditions. (*Exhibit "W", ¶ 6*).

49. Developers could have used these consultants to assist Milroy Golf in properly installing the irrigation system and overseeing any corrective work. (*Exhibit "W", ¶ 6*).

50. Dismal River's damages are identified on routine daily logs that do not specifically tie work to problems that are the responsibility of Milroy Golf. (*Exhibit "W", ¶ 7*).

51. Dismal River may have redesigned the course during the time that the routine daily logs were prepared, and it may not be possible to assign the daily log amounts to specific items of damage or to the redesign work. (*Exhibit "W", ¶ 8*).

## III. REPLY TO DEFENDANT'S ARGUMENT

A.   Standard of Review.

Plaintiff concurs with Defendant's analysis of the standard of review.

B.   Developers had actual notice of problems with the irrigation system prior to March, 2007. This notice, however, did not fulfill the Owner's obligations under the Bond.

In its brief, Defendant suggests that a genuine issue of fact may exist as to when Developers first became aware of problems on the project. This is not a fact at issue, however. Developers admits that it first became aware of potential problems on the project on March 22, 2006. (*Plaintiff's Statement of [and Defendant's Response to] Undisputed Facts, No. 9*). This was not a claim under the Bond. It was not until one year later that Dismal River's attorney gave formal notice of claim on March 1, 2007. (*Response to Plaintiff's Statement of Uncontroverted Facts, No. 22*). There is no evidence that Developers knew that Dismal River was ever considering declaring a contractor default or ever declared Milroy Golf to be in default and formally terminated Milroy Golf's right to complete the contract prior to March 1, 2007, as required by the Bond. These conditions precedent were never done by Dismal River, the Bond Obligee/Owner.

Some informal awareness of some undefined problems with the irrigation system nearly one year before the March 1, 2007 notice of claim was provided by Dismal River to Developers, does not excuse Dismal River's non-compliance with the conditions of the bond. This is not an accurate reflection of the law.

First, the conditions precedent required by the Bond of the Owner, and upon which Developers relies to support its position, are not ambiguous. The Performance Bond is a contract between Dismal River, Milroy Golf and Developers.  Any doctrine allowing liberality of

interpretation against an insurer only applies where there is ambiguity in the written instrument. Here, in fact, these conditions are set forth very clearly in Paragraph 3 of the Bond. Dismal River is a sophisticated commercial entity engaged in the construction of a large golf course project. In connection with this project, Dismal River required that Milroy Golf obtain a performance bond. A performance bond in the form of the industry standard American Institute of Architects ('AIA') A-312 form of Performance Bond was provided and accepted by Dismal River. Dismal River had knowledge of the Bond conditions and chose not to abide by them. Dismal River cannot ignore the plain and ordinary meaning of the Bond language.

Dismal River has not brought any such cases to the court's attention suggesting that the conditions precedent contained in the AIA A-312 Bond are ambiguous. In fact, the majority of jurisdictions that have reviewed this issue (identified in Plaintiff's Supporting Brief) have concluded that conditions precedent in a Performance Bond are binding upon the Owner and an Owner's failure to comply with them discharges the Surety from any obligation on the Bond.

Second, the conditions precedent in the AIA A-312 Bond are not mere notice provisions to be liberally construed. In a standard insurance contract, the contract is between the insurance company and the policy holder. The notice provision is designed to alert the insurer to a potential claim and allow it an opportunity to investigate. In that case, the insurer has a contractual duty to investigate upon receipt of notice, and the insured has a duty to cooperate with the insurer's investigation.

In the context of a Performance Bond, however, the contract is not merely between an Insurer and Owner – it also involves a third party, the Principal. This Principal has contractual rights and duties under its contract with the Owner. As a result, the Surety does not have the contractual right or ability to step in whenever it wants or whenever it becomes aware of

disputes, dissatisfactions, or complaints between the Owner and Principal. To do so would potentially subject the Surety to tortious interference with contract claims. There are disputes between Owners and Contractors on almost every construction project. The Surety's obligation and ability to discharge its contractual rights and obligations under the Performance Bond, only arise after the Owner fulfills the conditions precedent in the Bond. The problems rise to such a level only when the Owner/Obligee under the Bond unequivocally states that it is "considering declaring a contractor default." It is only when these disputes under the construction contract rise to said level under the Bond and cannot be resolved by the parties themselves that the Surety is justified, and contractually obligated, to become involved.

The AIA A-312 Bond form was developed with clear conditions precedent language to limit Surety involvement to those situations where in the opinion of the Bond Obligee (Dismal River), the termination of the Principal is justified. Notice of the Claim must be then formally given before the Surety can and should become involved. Courts interpreting the A-312 provisions have almost universally held that an Owner who fails to comply with the Bond's provisions has materially breached the Performance Bond contract and affected the substantial rights of the Surety. This is the reason that a Surety's obligation under the Bond is not enforced.

The cases cited by Dismal River do not involve the interpretation or construction of an AIA A-312 performance bond. Dismal River cites <u>Sch. Dist. No. 65R of Lincoln County v. Universal Sur. Co.</u>, 178 Neb. 746, 751, 135 N.W.2d 232, 235 (1965) for the proposition that a failure to comply with the formal requirements of a surety bond is immaterial. This is not what that case holds. In that case, the court was asked to extinguish a surety's liability under a bond because the owner made an allegedly "unauthorized" final payment to the defaulting contractor (in effect, the surety lost some of its security). The court looked at the construction contract

between the owner and contractor and determined that the final payment substantially complied with the construction contract requirements. It was in this context that the Court stated that "[f]ailure to comply with some of the formal requirements becomes immaterial". The court was referring to the construction contract, not the Bond. In any event, the owner had substantially complied with the contract provisions in that case. That did not happen here.

There is thus no evidence to raise a genuine issue of fact as to whether Dismal River complied with the clear conditions precedent of this A-312 Performance Bond. It did not. Thus, Developers is entitled to Summary Judgment as a matter of law.

C. **Genuine Issue of Material Fact on "Prejudice". There is No Such Genuine Issue.**

Prejudice is not an issue of material fact which must be proven when the Owner fails to comply with the Bond's conditions precedent.

As discussed extensively in Plaintiff's Brief, those courts construing the AIA A-312 Performance Bond have not required a showing of prejudice by the Surety in order for it to avoid liability under a Bond. While R.C. Walters Co., Inc. v. DeBower, 191 Neb. 544, 216 N.W.2d 515 (1974) does contains language that suggests Nebraska may require prejudice to a surety when notice of default is not properly provided by the owner, DeBower, is distinguishable.

First, the language of the DeBower bond only required that a notice of default be provided to the Surety after the default had occurred. It (1) did not involve an AIA A-312 Bond and its specific pre-default provisions, (2) did not require the Owner to inform the Surety prior to default that it was considering declaring a contractor default; (3) did not require the Owner to attempt a meeting of all the parties prior to the Owner declaring a contractor default; and (4) did not require the Owner to declare a contractor default and formally terminate the Contractor's

right to complete the contract before the Surety's contractual obligations were triggered and ripened.

Unlike the situation in DeBower, the Bond in this case specifically requires the Surety's involvement prior to the Owner/Bond Obligee declaring a contractor default. Dismal River did not follow the Bond provisions. Dismal River agreed that before Developers would be liable on the Bond in this case Dismal River would let Developers know that Dismal River was considering declaring a contractor default. It would allow Developers to get properly involved prior to declaring a contractor default. By contract, Dismal River agreed to allow Developers to exercise its contractual rights under the Bond. Under these circumstances, one could agree with the Escambia Court[1], that DeBower does not require an affirmative showing of prejudice by the Surety. Rather, prejudice is presumed.

Even if Developers is required to affirmatively show prejudice, there is evidence that demonstrates that it was deprived of the opportunity to mitigate its damages. Dismal River has offered no contrary evidence to raise a material issue of fact. Dismal River readily admits that it did not formally notify Developers of its claim until March 1, 2007. (*Response to Plaintiff's Statement of Uncontroverted Facts, No. 22*). This was after Dismal River spent in excess of $800,000 to correct alleged problems with the irrigation system on its own. (*Plaintiff's Additional Uncontroverted Facts, No. 46*). The Bond requirement of a "meet and confer" meeting did not occur until after the March 1, 2007 letter. Clearly, Dismal River had completed its remedial work before Developers was even given the contractual opportunity to elect its options of performance under the Bond.

Furthermore, Developers previously produced the Affidavit of Conrad Wozney to show that Developers likely could have reduced the cost of completion were it given a contractual

---

[1] School Bd. of Escambia County, Fla. v. TIG Premier Ins. Co., 110 F.Supp.2d 1351, 1354 (N.D. Fla. 2000).

opportunity to become involved in the process earlier. (*Plaintiff's Statement of Uncontroverted Facts, No. 28*). According to Mr. Wozney's Supplemental Affidavit, which is being filed contemporaneously herewith, Developers could have tapped the experience of several golf course managers and construction experts to assist it in evaluating the nature and extent of the problem. (*Plaintiff's Additional Uncontroverted Facts, No. 47*). By defining the scope of the corrective work early on, remediation could have been addressed comprehensively, rather than on a piecemeal basis as different symptoms of the irrigation problem manifested themselves. The owner may have been able to avoid the need to dig up the course, uncover the irrigation system and then return it to its prior state. (*Plaintiff's Additional Uncontroverted Facts, No. 48*).

Further, Developers could have used these experts to work with the Principal in order to address any problems in the design or construction of the irrigation system. (*Plaintiff's Additional Uncontroverted Facts, No. 49*). Were Developers able to use the Principal to complete performance, as would be its preference, this would result in obvious efficiencies and savings over a third party construction crew or inexperienced owner. It is highly probable, then, that Developers could have completed the project less expensively than the Owner eventually did.

Additionally, Dismal River may have redesigned portions of the course during the time that its daily logs were prepared. (*Plaintiff's Additional Uncontroverted Facts, No. 51*). These daily logs, however, do not appear to specify problems that are specifically the responsibility of the Principal. (*Plaintiff's Additional Uncontroverted Facts, No. 50*). For this reason, it may no longer be possible to assign the work identified on the daily logs to specific items of damage or to the redesign work required by the golf course designers and architect. (*Plaintiff's Additional Uncontroverted Facts, No. 51*).

The evidence before this Court for this Summary Judgment Motion establishes that Developers was in fact prejudiced by the failure to comply with the conditions precedent in the Bond. Dismal River's actions and omissions in this case have effectively stripped Developers of its ability to investigate the facts in order to show specific elements of prejudice. Developers has submitted general facts that show a high probability that it could have completed remediation less expensively than Dismal River did. Even if this court requires a showing of prejudice, Developers submits it has done so. Dismal River has offered no evidence to the contrary. Thus there is no issue of fact to be decided at trial.

## CONCLUSION

By failing to comply with the express conditions precedent of the Performance Bond, Dismal River prevented Developers from exercising its contractual rights under the Bond. As a result, Developers is relieved of its obligations under the Bond and is entitled to judgment as a matter of law. Further, Dismal River prejudiced Developers by beginning corrective work many months prior to the first notification to Developers that there might be problems on the project, and completing its remedial work before ever declaring the contractor in default and before triggering Developers' obligations under the Bond.

Wherefore, Developers Surety and Indemnity Company requests this Court Order Granting its Motion for Summary Judgment against the Defendant, Dismal River Club, LLC, and for such other relief as the Court deems just and proper.

Respectfully submitted,

**LEVY AND CRAIG**
*A Professional Corporation*

_____
Lawrence Lerner    MO #30955
llerner@levycraig.com
C. Eric Pfanstiel    MO #58462
epfanstiel@levycraig.com
1301 Oak Street
Kansas City, Missouri 64106
(816) 474-8181
Fax: 816/471-2186

and

**BALLEW COVALT, PC, LLO**

Victor E. Covalt III    Bar No. 16539
440 S. 13th Street, Suite C
P.O. Box 81229
Lincoln, Nebraska 68501-1229
(402) 436-3030
Fax: (402) 436-3031
Email: vcovalt@bsclawfirm.com

*Attorneys for Plaintiff,*
*Developers Surety and Indemnity Company*

## CERTIFICATE OF SERVICE

Service of the foregoing was effected via electronic transmission through the District Court's ECF filing system this 11th day of March, 2008 to all counsel of record.

_____
*Attorney for Plaintiff*

{P:\DOCS\6230\008\00263405;2 }           12