IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DEVELOPERS SURETY AND INDEMNITY COMPANY, | ) ) ) | 4:07CV3148 |
| Plaintiff, | ) ) | **MEMORANDUM** |
| v. | ) ) | **AND ORDER** |
| DISMAL RIVER CLUB, LLC, | ) ) | |
| Defendant. | ) | |

This matter is before the court on a motion for summary judgment filed by the plaintiff, Developers Surety and Indemnity Company ("Developers"). The plaintiff is an Iowa surety company that has its principal place of business in California. The defendant, Dismal River Club, LLC ("Dismal River"), is a Colorado limited liability company; all of its members are individuals who reside in Colorado. Jurisdiction is based on diversity of citizenship.[1]

## I. BACKGROUND

Developers seeks a declaratory judgment that it has no liability under a performance bond issued to Dismal River on behalf of Milroy Golf Systems, Inc. ("Milroy Golf"), in connection with a contract for the construction of an irrigation system on a golf course near Mullen, Nebraska. The performance bond is a standard form agreement, AIA A312, published by The American Institute of Architects. Nebraska law governs.

---

[1] Based on the parties' joint response to a show cause order (filing 89), the court is now satisfied that subject matter jurisdiction exists.

### *A.  Performance Bond Provisions*

Developers contends that it has no liability because Dismal River failed to comply with paragraph 3 of the bond, which provides:

3       If there is no Owner Default, the Surety's obligation under this Bond shall arise after:

> 3.1     The Owner has notified the Contractor and the Surety at its address described in Paragraph 10 below that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract.  If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

> 3.2     The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract.  Such Contractor's Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and

> 3.3     The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

(Filing 79-3, Attach. 2, at CM/ECF p. 3.)  "Contractor Default" is defined as a "[f]ailure of the Contractor, which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Construction Contract."  (*Id.*, ¶ 12.3 at CM/ECF p. 4.)

2

Developers' conditional obligations to perform and complete the project are set forth in paragraph 4 of the bond:

4      When the Owner has satisfied the conditions of Paragraph 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

> 4.1      Arrange for the Contractor, with consent of the Owner, to perform and complete the Construction Contract; or
>
> 4.2      Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors; or
>
> 4.3      Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Paragraph 6 in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's default; or
>
> 4.4      Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:
>
> > .1      After investigation, determine the amount of which it may be liable to the Owner and, as soon as practicable after the amount is determined, tender payment therefore to the Owner; or
> >
> > .2      Deny liability in whole or in part and notify the Owner citing reasons therefore.

3

(Filing 79-3, Attach. 2, at CM/ECF p. 3.)

Although not mentioned by Developers, paragraph 5 of the bond contains another notice provision.  It states:

> 5      If the surety does not proceed as provided in Paragraph 4 with reasonable promptness, the Surety shall be deemed to be in default on this Bond fifteen days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner.  If the Surety proceeds as provided in Subparagraph 4.4, and the Owner refuses the payment tendered or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

(*Id.*)

### B.  Uncontroverted Facts

 After carefully reviewing the parties' pleadings, briefs, and evidence, I find that there is no genuine issue concerning the truthfulness of the following facts:

1.      On April 27, 2005, Dismal River and Milroy Golf entered into a standard form AIA A101 contract for the construction of an irrigation system on the Dismal River Golf Course.  The contract specified that Milroy Golf would substantially complete the project within 120 calendar days.  On May 6, 2005, Developers, as surety, issued a standard form AIA A312 performance bond to Dismal River, as obligee, on behalf of Milroy Golf, as principal, in the penal sum of $534,885, which was the contract price for the project.

2.      Milroy Golf began working on the project in June 2005.  On July 23, 2005, Dismal River's superintendent, Kyle Jacobsen, sent an email to J. T.

4

Milroy (Milroy Golf) listing "several issues that are unacceptable at the Dismal River Club." (Filing 79-5, Attach. 4, at CM/ECF p. 2.) The email also indicated that Dismal River soon would be taking corrective action on some of these issues and charging Milroy Golf for the cost of this work.

4.     On October 24, 2005, Dismal River's separate sprinkler irrigation system design engineering consultant, Justen Patterson, provided a report letter to Dismal River which stated that "[t]here are many areas on the golf course with weeping [sprinkler] heads, some areas with installed pipes that were never finished to spec and problems with saddles blowing off or leaking because they were the wrong size for the pipe onto which they were fused." (Filing 79-6, Attach. 5, at CM/ECF p. 2.) The report letter also indicated that HDPE shavings were not blown out of the irrigation pipes during installation and were jamming valves. According to Mr. Patterson, Dismal River's remediation efforts began as early as September 30, 2005.

5.     According to J. T. Milroy, Dismal River demanded that the majority of Milroy Golf's crew leave the job site in late October 2005; that Dismal River agreed to employ a few members of Milroy Golf's crew in order to finish any remaining punchlist items and to complete project cleanup activities under the supervision of Dismal River's Superintendent, Kyle Jacobsen; and that Dismal River kept approximately $80,000 in retainage to cover the cost of such work. Milroy Golf substantially completed its work and removed its equipment and personnel from the job site by November 2005.

6.     On February 6, 2006, Developers sent Dismal River a "Request for Contract Status" inquiring whether the project was completed. On March 15, 2006, Dismal River, through its agent, Dick Burtness, signed the "Request for Contract Status" after indicating that the project was not completed and was not on schedule, and stating there were "[m]ajor issues yet to be resolved." (Filing

5

79-8, Attach. 7, at CM/ECF p. 2.)  Developers received the signed "Request for
Contract Status" on March 22, 2006.  This was the first information Developers
received indicating that there might be problems on the project.

7.      On April 28, 2006, Dick Burtness (Dismal River) sent a letter to J. T.
Milroy (Milroy Golf) requesting partial payment of $100,000 for damages and
inviting Mr. Milroy to view the evidence of defective performance.  It reads:

> Just a short note to tell you that the irrigation system you installed
> last year continues to be an absolute disaster.
>
> Naturally we have documented and taken photos of blowouts,
> incorrect pipe, dozens of HD material in mainline etc.
>
> I must tell you JT the cost and losses are now well over 200k and
> no end in sight.  It is so bad we do not dare water at night.  Last
> week a blowout on 14 took out 20 ft. by 6 ft. that was 6ft deep and
> we happened to be very close when it blew.
>
> I know you stood tall last fall and said you would stand the cost
> so I wanted to give you an update.  Jose is still here fulltime as
> well as 15 others just working on irrigation mistakes of last year.
>
> I would like to request that you send l00K to us as soon as
> possible.  This along with the credit of about 90K will bring you
> current.  It is my belief the total cost will be around 350-400K by
> the time we replace, repair and correct Howard's endless mistakes
> and mismanagement.
>
> I have assured Denver I would get this info to you and also if you
> wish to come out and see first hand all of the evidence we have
> accumulated and talk to the guys who are doing there best to fix
> this nightmare you are most welcome.

(Filing 79-10, Attach. 9, at CM/ECF p.2.)  This letter was not immediately
provided to Developers.

6

8.     On June 12, 2006, Mr. Burtness sent another letter to Mr. Milroy, this time demanding payment of $235,000 in settlement of Dismal River's claims and threatening a lawsuit if payment was not forthcoming.  The letter  reads:

It is most disappointing you have decided to ignore my past correspondence relative to the large liability you have relative to your bonded contract with Dismal River.  It appears your word and the reputation of your company which mayor may not be currently solvent is not of concern to you.  I hereby give you notice of the following intentions of Dismal River.

1. We will accept full and final payment of all obligations and liabilities of your company for a payment of $235,000.00 payable by July 1, 2006.

2. If you wish prior to that date to review our records or discuss with independent consultants who have reviewed your very shoddy unprofessional work as well as very likely intentionally damaging work to this project you are most welcome.

Because I am very aware your intentions may well be to ignore this letter as you have past correspondence I am sending a copy to your father as well as your bonding company.

Again I want to make it very clear[:] July 1, 2006 payment of $235,000.00 or we will immediately file suit and look to the court for a fair and final outcome.

(Filing 79-11, Attach. 10, at CM/ECF p. 2.)

9.     On June 19, 2006, Dick Burtness (Dismal River) sent an email to Joe Riter, the insurance agent who secured the performance bond on behalf of Dismal River, and attached a copy of its June 12th letter.  Mr. Riter met with J. T. Milroy on June 23, 2006, to discuss the situation and to hear Milroy Golf's version of events.  This information was then forwarded to Developers.

10.     On June 24, 2006, Mr. Riter responded to Mr. Burtness's June 19th email and requested details and documentation from Dismal River supporting the work and additional costs of the project.  Mr. Riter wrote:

> Thanks for the letter you emailed me last week.
>
> I met with the Milroy's yesterday to discuss the situation with them.
>
> I need to report to the Bonding Company the details and circumstances regarding this project.
>
> I have asked the Milroy's to prepare a timeline for me detailing the important dates, milestones and/or incidents surrounding this project.
>
> Would you please do the same for me?  I will need the details and documentation of the total additional costs associated with this project.  Your letter to J T Milroy mentions $350,000-400,000 as a possible ultimate number.
>
> What ever you have to date will get us started. You mention $200,000 to date.
>
> I expect to have the Milroy's information in 1-2 weeks.  Can you get me your information in this same time frame?
>
> Please call (or Email if you prefer) any questions or concerns you may have.

(Filing 79-12, Attach. 11, at CM/ECF p. 2.)

11.     On June 29, 2006, Mr. Riter sent a follow-up email to Mr. Burtness. That same day, Mr. Burtness sent a letter to Mr. Riter confirming that he received the prior e-mails, complaining of the problem Dismal River was having with Milroy Golf, and adding, "I strongly recommend you send

someone out here to see all the evidence and talk to our maintenance people."
(Filing 79-15, Attach. 14, at CM/ECF p. 2.)  No documentation was provided.

12.    On November 13, 2006, Developers sent a letter to Milroy Golf stating
that it had been monitoring a potential bond claim but had not received any
further information from Dismal River.  It therefore requested a status report
from Milroy Golf regarding the details of the contract dispute and any attempts
to resolve it.  No response to this letter is in evidence.

13.    On  March 1, 2007, counsel for Dismal River again demanded payment
of damages from Milroy Golf and claimed that the cost for repairs to the golf
course exceeded $800,000.  Milroy Golf responded to this letter on March 15,
2007, and requested an itemization of the claimed damages and also supporting
documentation.

14.    In a separate letter sent to Developers on March 1, 2007, Dismal River's
counsel stated:

>       The purpose of this letter is to advise you of the problems
> on the project at the Dismal River Golf Course in Mullen,
> Nebraska. As you recall under the above-referenced bond number
> you were the surety for the labor, materials and equipment for this
> project.   The contractor walked off the job before it was
> completed so therefore the final work had to be completed by
> others.  That contract was in the amount of $534,885.00, which
> was the amount of the bond.  The damages that have been incurred
> by the golf course appear to be in excess of $800,000.00.  We
> want to put you on notice for your information.  The contractor
> failed to meet the standards of his contract and also failed to
> complete the contract.

>       I would suggest that a meeting be arranged to discuss this
> problem prior to more formal legal steps being taken.  I would ask

that you respond within two weeks of the date of this letter indicating an interest in meeting and discussing this problem.

(Filing 79-18, Attach. 17, at CM/ECF p. 2.)

12.    On March 23, 2007, Developers responded to Dismal River's counsel by expressing an interest in meeting to discuss the problems and requesting that supporting documentation be provided in advance of the meeting.  The letter contained a reservation of rights clause, stating that "[n]othing herein should be deemed to be a waiver or modification of any of the Surety's rights and/or defenses and the Surety hereby reserves all of its rights and defenses under any bond, contract, agreement and/or applicable law."  (Filing 79-20, Attach. 19, at CM/ECF p. 2.)

13.    On May 8, 2007, Developers sent another letter to Dismal River's counsel and renewed the request for documentation.  This letter also concluded with a reservation of rights clause.

14.    On May 18, 2007, Dismal River's counsel sent a letter to Developers providing some supporting documentation and proposing that a meeting be held at the Dismal River Golf Course.  On June 1, 2007, Developers responded to this letter and agreed to the meeting while requesting that certain missing information be provided.   This letter again concluded with a reservation of rights clause, but also stated that "it appears from what we have been provided to date that the Bond procedures, conditions and notices were not followed." (Filing 81-3, Attach. 2, at CM/ECF p. 4.)

15.    The scheduled meeting was held on June 11-12, 2007, and was attended by representatives of the surety, the principal, the owner, and the architect.  The present action was filed by Developers on the first day of the meeting.

10

16.    According to Dismal River's accounting, $872,600.00 was spent by it working on the project from September 30, 2005 to October 24, 2006.

## II. DISCUSSION

In its complaint, Developers requests a declaratory judgment that "the claims presented by Defendant are not covered by the Performance Bond and Plaintiff is entitled as a matter of law to decline coverage on those claims[.]" (Filing 1, at CM/ECF p. 5.)  Even though no demand for payment was made upon Developers by the March 1, 2007 letter from Dismal River's counsel, the legal issue presented by this action is whether Developers would breach its contractual obligations under the performance bond by denying liability for the $872,600.00 in damages that Dismal River claims is owed to it by Milroy Golf.  I conclude that Developers cannot be deemed to be in default under paragraph 5 of the bond, and therefore cannot be sued for breach of contract by Dismal River, because its obligation to complete the project or to pay damages under paragraph 4 never arose.

In support of its motion for summary judgment, Developers argues that Dismal River completely failed to comply with paragraph 3 of the performance bond.  That is to say, it contends that Dismal River failed to (1) provide notice to Developers and Milroy Golf that it was considering declaring a contractor default, (2) request and attempt to arrange a conference with Developers and Milroy Golf to discuss methods of performing the contract, (3) declare a contractor default and formally terminate Milroy Golf's right to complete the contract, and (4) agree to pay the balance of the contract price to Developers or a replacement contractor.  Dismal River does not directly refute these contentions, but argues that (1) "there is a genuine issue of fact as to whether Developers had actual notice of the problems with the sprinkler system before March 2006, when it alleges that it first received an indication of problems[,]" and (2) "there is a genuine issue of fact as to whether Developers was prejudiced by Dismal River's alleged failure to comply with the notice provisions of the

11

Performance Bond" because "there is no evidence that Developers would have been able to remedy the situation for less than what Dismal River spent to make the repairs to the sprinkler system." (Filing 80, at CM/ECF pp. 14, 15.)

As to Dismal River's first argument, I find no evidence that Developers knew of any problems at the project prior to March 22, 2006, when it received a contract status report from Dismal River indicating that there were "major" unresolved issues.[2] In any event, subparagraph 3.1 of the performance bond specifically requires the owner to give notice to both the contractor and the surety that it is "considering declaring a Contractor Default."

Although the Nebraska Supreme Court has not had occasion to consider the language of an AIA A312 performance bond, courts in other jurisdictions have consistently held that the notice requirement and other provisions of paragraph 3 are conditions precedent to the surety's obligation to perform under paragraph 4. *See, e.g., United States ex rel. Platinum Mechanical, LLC v. U.S. Surety Co.*, No. 07 Cv. 3318(CLB), 2007 WL 4547849, *3 (S.D.N.Y. Dec. 21, 2007) (granting summary judgment to surety where owner failed to provide proper notice under AIA A312 performance bond that it was considering declaring contractor in default); *120 Greenwich Development Associates, LLC v. Reliance Ins. Co.*, No. 01 Civ. 8219(PKL), 2004 WL 1277998, *12 (S.D.N.Y. June 4, 2004) (holding that the language of Paragraph 3 "creates unambiguous preconditions for triggering [the surety's] obligations under the Bond"); *U.S. Fidelity and Guar. Co. v. Braspetro Oil Services Co.*, 369 F.3d 34, 51 (2nd Cir. 2004) (stating that "Paragraph 3 of the [AIA A312] Bonds contained a number of conditions precedent to the Sureties' obligations under the Bonds."); *Enterprise Capital, Inc. v. San-Gra Corp.*, 284 F.Supp.2d 166, 179 n. 4 (D.Mass. 2003) (granting summary judgment to surety, noting that "other

---

[2] Dismal River even admits elsewhere in its brief that "[t]his was the first information Developers received that there may be problems on the Project." (Filing 78, at CM/ECF pp. 4-5, ¶ 9; filing 80 at CM/ECF p. 3, ¶ 9.)

courts have consistently interpreted the language in [Paragraph 3 of] this Performance Bond—'the Surety's obligation under this Bond shall arise after ...'—to indicate the listing of conditions precedent."); *AgGrow Oils, L.L.C. v. National Union Fire Ins. Co. of Pittsburgh*, 276 F. Supp. 2d 999, 1017 (D.N.D. 2003) ("[T]he requirements of paragraph 3 are conditions precedent to the surety's bond performance."), *aff'd*, 420 F.3d 751 (8th Cir. 2005); *Bank of Brewton, Inc. v. Int'l Fid. Ins. Co.*, 827 So.2d 747, 754 (Ala. 2002) ("The [owner] was required by the performance bond to give proper notice, to call a meeting, to discuss the problems, and to attempt to resolve them; and then to declare a contractor default, formally terminating the contractor's right to complete the contract at least 20 days after giving notice; and to agree to pay the balance of the contract to the surety or to a new contractor who would complete the contract as originally agreed."); *North American Specialty Ins. Co. v. Chichester School District*, No. Civ.A. 99-2394, 2000 WL 1052055, *16 (E.D.Pa. July 20, 2000) ("[T]he paragraph three obligations act as conditions precedent to the paragraph four obligations of the surety.").

I predict that the Nebraska Supreme Court would reach the same result, as demonstrated by its recent decision in *State ex rel. Wagner v. Amwest Sur. Ins. Co.*, 738 N.W.2d 805 (Neb. 2007), requiring strict compliance with respect to default notice provisions in payment bonds.  The Court stated: "Where a guarantor attaches a certain condition or conditions to the agreement, such condition or conditions must be construed in favor of the guarantor, and the failure of a creditor to strictly comply with any condition or conditions invalidates the guaranty.  A stipulation for notice of default is a condition of liability which may always be imposed.  Where a contract of guaranty specifically requires notice of default, the failure to give such notice discharges the guarantor's obligations." 738 N.W.2d at 811 (footnotes omitted). *See also Dockendorf v. Orner*, 293 N.W.2d 395, 397-98 (Neb. 1980) (where giving notice of loss within a prescribed time was made a condition precedent to liability under a surety bond, plaintiff's failure to comply with such provision prevented recovery). I therefore conclude that the provisions of paragraph 3 of the AIA A312 performance

bond are conditions precedent under Nebraska law, and that the surety's obligation to act under paragraph 4 of the bond does not arise unless such conditions are met.[3] *See Cimino v. FirsTier Bank, N.A.,* 530 N.W.2d 606, 613 (Neb. 1995) ("A condition precedent is . . . a condition which must be fulfilled before a duty to perform an existing contract arises."); *Harmon Cable Communications of Nebraska Ltd. Partnership v. Scope Cable Television, Inc.,* 468 N.W.2d 350, 359 (Neb. 1991) ("As a general rule, a condition must be exactly fulfilled before liability can arise on the contract.").

Although it did not use the terminology of subparagraph 3.1, Dismal River clearly indicated in its June 12, 2006 demand letter to Milroy Golf that there was a "contractor default" as defined in the bond. A copy of this letter was provided to Developers on or about June 19, 2006, and, as a result, Developers requested information from Dismal River and Milroy Golf concerning their contract dispute. Dismal River invited Milroy Golf to review records and to discuss the sprinkler system problems with Dismal River's outside consultant. On June 29, 2006, Dismal River also urged Developers to "send someone out here to see all the evidence and talk to our maintenance people." These facts may be sufficient to create a jury issue as to whether Dismal River effectively fulfilled the conditions of subparagraph 3.1. However, there is no evidence that Dismal River formally terminated Milroy Golf's right to complete the project after sending the June 12, 2006 demand letter, or that it agreed to pay the balance of the contract price to complete the project. In other words, there is no evidence that subparagraphs 3.2 or 3.3 were satisfied. There also is no evidence that these conditions were waived. Developers therefore is not obligated to complete the project or to pay damages as provided in  paragraph 4 of the bond.

---

[3] However, it is also the rule in Nebraska that absent a special provision in the contract, there is no duty on part of the owner to notify a surety company of the default of the principal contractor. *See School Dist. No. 65R of Lincoln County v. Universal Sur. Co.,* 135 N.W.2d 232, 237 (Neb.1965).

14

Additionally, Dismal River never made a written demand upon Developers under paragraph 5 to perform its bond obligations. Until such a demand is made by the owner and rejected or ignored by the surety, there can be no default on the bond and no cause of action for breach of contract. This topic was thoroughly explored by the United States Court of Appeals for the First Circuit in *Seaboard Surety Co. v. Town of Greenfield*, 370 F.3d 215 (1st Cir. 2004), in affirming the grant of summary judgment to a surety based upon paragraph 5 of an A312 performance bond. The First Circuit held that even though the owner had fully complied with paragraph 3, and even assuming that the surety had failed to promptly perform its obligations under paragraph 4, the owner's failure to give adequate notice under paragraph 5 defeated its claim as a matter of law:

> The parties agree that [the owner] Greenfield complied with the notice requirements regarding [the contractor] ICC's default provided by Paragraph 3 of the performance bond. [The surety] Seaboard argues, however, that Greenfield failed to provide notice of Seaboard's default before terminating Seaboard's involvement, as required by Paragraph 5. Greenfield contends that Seaboard had previously breached the performance bond by failing to take prompt action following ICC's default as required by Paragraph 4 and that Greenfield's communications with Seaboard complied with Paragraph 5's notice requirements. [FN1. Greenfield argues in the alternative that Paragraph 5 does not make notice a condition precedent of surety default but instead simply provides an optional vehicle through which the owner may protect itself from any future claims of the surety. We find this reading of Paragraph 5 contrary to the unambiguous language of the bond, and, under Massachusetts law, "when the wording of a contract is unambiguous, the terms will be enforced." *Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 991 (1st Cir.1988) (citing *Edmonds v. United States*, 642 F.2d 877, 881 (1st Cir.1981)).]

> We find it unnecessary to address Seaboard's compliance with Paragraph 4. The district court examined the evidence on the issue and denied Greenfield's motion for summary judgment because "the Court cannot find as a matter of law that Seaboard committed a material breach

15

of the terms and conditions of the Bond by failing to promptly select and undertake action under paragraph 4." *Seaboard Sur. Co.*, 266 F.Supp.2d at 195. The district court opinion ultimately rests, however, on Greenfield's failure to comply with Paragraph 5. The district court concludes that Greenfield's Paragraph 4 claims against Seaboard "necessarily fail ... due to Greenfield's material breach of the Bond," and describes Greenfield's breach thus: "Because a clear and direct default notice was not served pursuant to Paragraph 5, the Court finds that Greenfield was in material breach of the Bond when it ceased its dealings with Seaboard and hired another company to complete the Project." *Id.* at 198. The district court therefore concludes that "Greenfield's refusal to allow Seaboard to complete the Project renders the Bond null and void and discharges Seaboard from any and all liability under the Bond." *Id.* (citing *St. Paul Fire & Marine Ins. Co. v. City of Green River*, 93 F.Supp.2d 1170 (D.Wyo.2000), *aff'd*, 6 Fed. Appx. 828 (10th Cir.2001)).

We agree with the district court's conclusion that Greenfield's compliance with Paragraph 5 is dispositive of both parties' claims. Even assuming that Seaboard failed to provide the prompt response to contractor default required by Paragraph 4, the surety default provision of Paragraph 5 constitutes an important contractual right of the surety. Paragraph 5 provides the surety fifteen days during which it may attempt to cure the alleged breach prior to default and thus to minimize its economic exposure. Failure to provide this notice constitutes a material breach of the bond. *School Bd. of Escambia Cty. v. TIG Premier Ins. Co.*, 110 F.Supp.2d 1351, 1353 (N.D.Fla. 2000)("[F]ailure to adhere to a performance bond notification requirement is a material breach, resulting in the loss of an obligee's rights under the bond."); *St. Paul*, 93 F.Supp.2d at 1178 ("Courts have consistently held that an obligee's action that deprives a surety of its ability to protect itself pursuant to performance options granted under a performance bond constitutes a material breach, which renders the bond null and void."); *cf. Dragon Constr., Inc. v. Parkway Bank & Trust*, 287 Ill.App.3d 29, 222 Ill.Dec. 648, 678 N.E.2d 55, 58 (Ill.App.Ct.1997) (owner's "failure to provide adequate notice of [contractor's] termination ... stripped [surety] of its

right to limit its liability and constituted a material breach of contract which rendered the surety bonds null and void.").

Greenfield seeks refuge in the contention that under Massachusetts law "compensated sureties ... ought not to be relieved from their obligations on merely technical grounds, not affecting substantially the character of the undertaking which they assumed." *Bayer & Mingolla Constr. Co, Inc. v. Deschenes*, 348 Mass. 594, 205 N.E.2d 208, 211 n. 4 (1965)(quoting *Maryland Cas. Co. v. Dunlap*, 68 F.2d 289, 291 (1st Cir.1933)). While it is true that "Massachusetts courts have held that lack of prompt notice to the compensated surety of a contractor's default (as required by a Performance Bond) does not discharge the surety if it is not harmed," notice requirements "exist [ ] precisely to provide the surety an opportunity to protect itself against loss by participating in the selection of the successor contractor to ensure that the lowest bidder is hired and damages mitigated." *Enterprise Capital, Inc. v. San-Gra Corp.*, 284 F.Supp.2d 166, 177 (D.Mass.2003) (citations omitted). In the context of surety default, the notice provision similarly provides an opportunity for the surety to cure the breach and thus mitigate damages. As the court concluded in Enterprise Capital, "even if [Seaboard] must show injury, loss, or prejudice, it meets this hurdle, given its deprivation of mitigation opportunities." *Id.*

*Id.*, at 219-20.

The letter that Dismal River's counsel sent to Developers on March 1, 2007, did not demand that the surety perform its obligations under paragraph 4 of the bond, did not give any indication that Dismal River considered Developers in default, and did not threaten that a lawsuit would be filed against Developers. The letter merely indicated that "[t]he contractor failed to meet the standards of his contract and also failed to complete the contract" and informed Developers that "[t]he damages that have been incurred by the golf course appear to be in excess of $800,000.00." The stated purpose of the letter was only "to advise [Developers] of the problems on the project[.]" No reasonable jury could construe this letter as being a demand notice

17

under paragraph 5. I therefore find as a matter of law that Developers is not in default on the bond, regardless of whether Dismal River complied with paragraph 3.

Finally, regarding Dismal River's argument that Developers must prove prejudice, it is immaterial whether Developers could have completed the project for less than the amount spent by Dismal River—or, more to the point, for less than the amount of the bond—if Developers' obligation to perform was never triggered by Dismal River meeting the conditions of paragraph 3. I note, however, that the only time limit stated in paragraph 3 is the requirement that the surety be notified at least 20 days before the contractors' right to complete the contract is formally terminated. Paragraph 5 also contains no express time limit for serving a demand notice on the surety. A question therefore arises whether Dismal River might still be able to satisfy the conditions precedent of paragraphs 3 and 5.

According to the Restatement, which was cited with approval by the Nebraska Supreme Court in *Harmon Cable*, 468 N.W.2d at 359:

> (1) Performance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused.

> (2) Unless it has been excused, the non-occurrence of a condition discharges the duty when the condition can no longer occur.

> (3) Non-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur.

*Restatement (Second) of Contracts* § 225 (1981). "The unexcused non-occurrence of a condition has two possible effects on the duty subject to that condition. The first effect always follows and the second often does. The first, stated in Subsection (1), is that of preventing performance of the duty from becoming due. This follows from the definition of "condition" in § 224. Performance of the duty may still become due, however, if the condition occurs later within the time for its occurrence. The

18

non-occurrence of the condition within that time has the additional effect, stated in Subsection (2), of discharging the duty.  The time within which the condition can occur in order for the performance of the duty to become due may be fixed by a term of the agreement or, in the absence of such a term, by one supplied by the court (§ 204). . . ." *Id.*, Comment a.

Section 204 of the Restatement provides: "When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." *Restatement (Second) of Contracts* § 204 (1981).  This rule is also in accord with Nebraska law.  As stated in *Donaldson v. Farm Bureau Life Ins. Co.*, 440 N.W.2d 187, 191 (Neb. 1989): "Where a contract is silent with respect to the time of performance, a reasonable time for performance will be presumed or implied by law."  It has also been held that "[w]hat constitutes a reasonable time must be determined from the general nature and circumstances of each case." *Chilton Accounts Receivable Management, Inc. v. Project Life Ministries, Inc.*, 406 N.W.2d 133, 136 (Neb. 1987) (quoting *Clemens Mobile Homes, Inc. v. Guerdon Industries, Inc.*, 260 N.W.2d 310, 313 (1977)).

Although not specifically discussed by the First Circuit in *Seaboard Surety*, the finding that the owner committed a material breach of contract by failing to give a demand notice to the surety necessarily required the courts to supply paragraph 5 of the bond with a "reasonable time" term.  *See* Subsection (3) of Restatement § 225 ("Non-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur.").  Stated somewhat differently, the First Circuit effectively held that the owner's failure to satisfy paragraph 5's notice requirement within a reasonable time discharged the surety's duty to perform because "the condition can no longer occur."  *See* Subsection (2) of Restatement § 225.

19

The Nebraska Supreme Court reached a similar result in *R. C. Walters Co., Inc. v. DeBower*, 216 N.W.2d 515, 517 (Neb. 1974), in which a contractor's performance bond provided: "It shall be a condition precedent to any right of recovery hereunder that; in the event of any default on the part of the Principal, a written statement of the particular facts showing the date and nature of such default shall be immediately given by the Obligee to the Surety and shall be forwarded by registered mail to the Surety." *Id. at 516*. Both parties conceded that the requirement in the bond that notice of default "be immediately given" meant within a reasonable time. The Nebraska Supreme Court stated the applicable rule of law to be that "[w]hen a contractor's performance bond requires that notice of default by the contractor be given to the surety within a reasonable time and the failure to give such notice results in prejudice or damage to the surety, the principal cannot recover on the bond." *Id.* It then ruled that a 22-month delay in providing such notice was unreasonable because the partially completed contract (to reappraise property for county taxation purposes) lost nearly all of its value during that lengthy period of time. The Court reasoned that had the surety "been given prompt notice of the situation it could likely have arranged for completion of the work by [the contractor] or another appraisal firm and reduced the damages sustained." *Id.*

With respect to insurance policies, the Nebraska Supreme Court has held that "[p]rejudice is established by examining whether the insurer received notice in time to meaningfully protect its interests." *Dutton-Lainson Co. v. Continental Ins. Co.*, 716 N.W.2d 87, 102 (Neb. 2006) (citing *Mefferd v. Sieler & Co.*, 676 N.W.2d 22 (Neb. 2004)). This generally is a question of fact for a jury to decide, but the Nebraska Supreme Court in several cases has determined as a matter of law that an insurer was prejudiced by late notice. *See Mefferd*, 676 N.W.2d at 28 (liability insurer not notified until after default judgment entered against insured); *Deprez v. Continental Western Ins. Co.*, 584 N.W.2d 805, 809 (Neb. 1998) (insured's failure to give notice of uninsured motorist claim until 4 years after accident); *Herman Bros., Inc. v. Great West Cas. Co.*, 582 N.W.2d 328, 335 (Neb. 1998) (insured's 20-month delay in

20

notifying excess liability insurer of the filing of NLRB complaint).  In the *DeBower* case, of course, the Court also held as a matter of law that the surety was prejudiced by the obligee's 22-month delay in giving notice of default.

The facts in the present case show that Dismal River was dissatisfied with Milroy Golf's work as early as July 2005 and indicated at the time that it would be taking corrective action and charging Milroy Golf for the work.   Some of this work actually began at the end of September 2005.  About one month later, Dismal River obtained a report from a consultant detailing problems with the system and Milroy Golf either walked off the job or was dismissed from the project, possibly pursuant to a separate agreement with Dismal River not involving Developers.  In any event, the parties agree that Milroy Golf's work was substantially completed by November 2005.  (Filing 78 at CM/ECF p. 4, ¶ 3;  filing 80 at CM/ECF p. 2, ¶ 3.)   Had Developers been notified at that time, or even earlier, it might have pursued its first option under paragraph 4 of the bond by attempting to arrange for Milroy Golf to complete the project with the consent of Dismal Golf.  As a practical matter, that option is no longer available now that Dismal River has completed the work on its own.  I therefore find as a matter of law that Dismal River cannot give an effective demand notice under paragraph 5 because Developers' ability to perform its obligations under paragraph 4 have been impeded to a significant extent by Dismal River's delay.

## III. CONCLUSION

Developers currently has no liability under the performance bond because Dismal River has failed to satisfy the conditions precedent of paragraphs 3 and 5 of the bond (although there may be a jury issue regarding subparagraph 3.1).  Also, because Developers' ability to discharge its obligations under paragraph 4 would be prejudiced, it is no longer possible for those conditions precedent to be satisfied by Dismal River.

Accordingly,

IT IS ORDERED that the plaintiff's motion for summary judgment (filing 77) is granted.  Final judgment shall be entered by separate document providing that the claims presented by the defendant in its March 1, 2007 correspondence to the plaintiff and to Milroy Golf Systems, Inc., are not covered by the parties' performance bond and the plaintiff is entitled as a matter of law to decline coverage on those claims.

May 22, 2008.                          BY THE COURT:

                                       s/ *Richard G. Kopf*
                                       United States District Judge